G. William CARLSON and Contact Results, Inc., a Pennsylvania corporation, for themselves and derivatively on behalf of CR Services Corp., a Delaware corporation, Plaintiffs,

v.

Charles HALLINAN, Gary Gordon, CR Services Corp., a Delaware corporation, TC Services Corp., (d/b/a "Telecash"), a Delaware corporation, Main Street Services Corp. (d/b/a "Easy Cash"), a Delaware corporation, TCS Management Inc., a Delaware Corporation, and TC Management Inc., a Delaware corporation, Defendants.

Civil Action Nos. 19808, 19466.

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 23, 2005.
Decided: March 21, 2006.

512

Neal C. Belgam, Esquire, Alisa E. Moen, Esquire, Blank Rome LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

Wheeler K. Neff, Esquire, Wilmington, Delaware; Kenneth M. Dubrow, Esquire, The Chartwell Law Offices LLP, Philadelphia, Pennsylvania, Attorneys for Defendants.

## OPINION

PARSONS, Vice Chancellor.

This direct and derivative action arises out of a dispute between two men engaged in the business of making short term, unsecured loans. Plaintiffs have asserted against various defendants direct claims for breach of contract, derivative claims for breach of fiduciary duties and aiding and abetting said breach and claims for attorneys' fees for a prior, related action and for this action. Specifically, plaintiffs assert that defendant Charles Michael

Hallinan breached an oral agreement with plaintiffs by firing plaintiff G. William Carlson, paying himself and defendant Gary Dave Gordon executive compensation and authorizing the payment of certain management fees. Plaintiffs also assert that the individual defendants breached fiduciary duties they owed nominal defendant CR Services Corp. ("CR") by paying themselves an excessive amount of executive compensation, by authorizing CR to pay certain management fees, by causing CR to bear the expenses of other entities, by abandoning and diverting CR's business and usurping a corporate opportunity of CR, by terminating Carlson to facilitate said breaches and by causing CR to pay for their defense of this action. Finally, plaintiffs assert that certain corporate defendants aided and abetted the aforementioned breaches of fiduciary duties. Plaintiffs seek damages, both for their direct and derivative claims, the dissolution of CR and the appointment of a custodian or receiver and attorneys' fees on their derivative claims.

These issues formed the basis for a seven day trial held from November 16 to 24, 2004. After post-trial briefing and argument, defendants moved to supplement the record, and plaintiffs opposed that motion. This Opinion embodies the Court's post-trial findings of fact and conclusions of law, as well as its ruling on defendants' motion to supplement.

For the reasons stated, the Court denies the motion to supplement and concludes that Hallinan breached the oral contract with Plaintiffs, Hallinan and Gordon committed multiple breaches of their fiduciary duties to CR, certain corporate defendants aided and abetted certain of those breaches of fiduciary duty, Plaintiffs are entitled to their attorneys' fees for the Section 220 action and for the derivative claims on which they prevailed in this action. The Court further holds that CR should be dissolved and a receiver appointed to wind up its affairs.

## I. BACKGROUND

### A. The Parties

Carlson is the majority shareholder, a director and President of plaintiff Contact Results, Inc. ("Contact," and collectively with Carlson, "Plaintiffs").[1] Contact is a Pennsylvania corporation in the business of providing communications and technical services to the payday loan industry.[2] Contact is the record owner of 30% of the authorized, issued and outstanding common stock of defendant CR.[3] Carlson is a director and former President of CR.[4]

Defendant Hallinan is the Chairman of the Board of Directors of CR and, with 65% of its authorized, issued and outstanding stock, the controlling shareholder.[5] Hallinan, whether directly or through another wholly owned company, is the sole shareholder and Chairman of the Board of Directors of defendants TC Services Corp. d/b/a Telecash ("TC") and Main Street Services Corp. d/b/a Easy Cash ("Main Street").[6] CR, TC and Main Street are all

---

1. Revised Pretrial Stip. ¶ II.2; Tr. at 7–8. Citations in this form are to the trial transcript ("Tr.") and indicate the page and, where it is not clear from the text, the witness testifying.

2. Revised Pretrial Stip. ¶ II.1. Payday loans are short term, unsecured loans so named because their due date is the borrower's next pay date. Tr. at 26–27 (Carlson).

3. Revised Pretrial Stip. ¶ II.1.

4. Id. ¶ II.2.

5. Id. ¶ II.4; Tr. at 472.

6. Revised Pretrial Stip. ¶ II.4; Tr. at 472–73.

Delaware corporations engaged in the payday loan business.[7] All three corporations operate from the same offices in Bala Cynwyd, Pennsylvania.[8] Hallinan also controls several other nonparty payday loan companies, including Tahoe Financial Advisors d/b/a Axcess Cash ("Axcess") and CRA Services d/b/a Cash Net ("CRA").[9]

Defendant Gordon is a director and the Vice President of CR.[10] He also holds the remaining 5% of the authorized, issued and outstanding stock of CR.[11] In addition, Gordon works for TC and serves as its Controller.[12]

## B. The Formation and Initial Operation of CR

In the summer of 1998, Contact began providing services for TC.[13] At that time, Hallinan owned 60% of the shares of TC, while Rick Mickman owned 40%.[14] Hallinan and Mickman had been involved in the payday loan business together for several years.[15] Contact was to develop software and technology solutions to enhance the efficiency of TC's operations.[16] The contract with TC provided Contact with needed business as it had begun to fall on hard times.[17]

Soon after Contact began providing services for TC, Carlson, Hallinan and Mickman began discussing the creation of another payday loan company.[18] These discussions culminated in the formation of CR in or about February 1999.[19] Hallinan loaned CR approximately $750,000 [20] and the company made its first loan in early May 1999.[21]

From its formation until August 2000, CR operated pursuant to an oral agreement between Carlson, Hallinan and Mickman and without any organic documents, e.g., articles of incorporation or a stockholders' agreement.[22] Pursuant to this oral agreement, Hallinan owned 55% of the company, Contact owned 25% and Mickman owned the remaining 20%.[23] Carlson, Hallinan and Mickman agreed to

---

**7.** Revised Pretrial Stip. ¶¶ II.3, II.5. Plaintiffs dropped their claims against defendant TCS Management Inc. Id. ¶ II.5 n.1. The Court also assumes that Plaintiffs have dropped their claims against defendant TC Management Inc. because no mention was made of them at trial or in post-trial briefing.

**8.** Tr. at 719 (Hallinan).

**9.** Revised Pretrial Stip. ¶¶ II.5.

**10.** Tr. at 1169. The Court will refer to Hallinan and Gordon collectively as the "Director Defendants."

**11.** Revised Pretrial Stip. ¶ II.6.

**12.** Id. Tr. at 1168.

**13.** Tr. at 31 (Carlson). TC originally was known as RAC. The company then became Telecash and, finally, TC. Tr. at 147 (Mickman). Because the record is not clear as to when these changes occurred, the Court will simply refer to the entity as TC.

**14.** Tr. at 148 (Mickman).

**15.** Tr. at 131–32 (Mickman).

**16.** Tr. at 27–29 (Carlson); Tr. at 764 (Hallinan).

**17.** Tr. at 277–78 (Carlson).

**18.** Tr. at 31–32 (Carlson).

**19.** Tr. at 503–04 (Hallinan); Revised Pretrial Stip. ¶ II.7.

**20.** See Tr. at 43 (Carlson); PX 6 (Secured Promissory Note for $750,000). CR eventually paid off this loan plus 24% interest per annum. Tr. at 90 (Carlson).

**21.** Tr. at 79 (Carlson).

**22.** Tr. at 53–54 (Carlson); Tr. at 137 (Mickman); Tr. at 506–08 (Hallinan).

**23.** Tr. at 37 (Carlson); Tr. at 138 (Mickman).

serve as directors of the company,[24] but the company neither held formal board meetings nor reduced its decisions or the deliberations of its directors to writing.[25] CR operated out of Contact's offices in West Chester, Pennsylvania with Carlson working as its day-to-day manager and holding the title of President.[26] Carlson was paid, through Contact, $11,000 per month.[27]

In July 1999, Hallinan bought out Mickman's interest in CR and TC.[28] Carlson and Hallinan continued to operate CR pursuant to the oral agreement.

## C. The CR Stockholders' Agreement

In or around August 2000, Carlson, Gordon and Hallinan executed a Stockholders' Agreement (the "CRSA") "dated as of May 1, 1999."[29] The CRSA provided for the issuance of 65% of the shares of CR to Hallinan, 30% to Contact and 5% to Gordon.[30] Paragraph three of the CRSA made Carlson, Gordon and Hallinan directors, while paragraph four made Carlson the President, Gordon the Vice President and Hallinan the Chairman, Secretary and Treasurer.[31] The CRSA also prohibits Carlson from working in the payday loan industry for a period of two years following the termination of his relationship with CR.[32]

The CRSA contains a voting agreement pursuant to which the signatories

agree[] to vote all Shares for the election of directors in a manner consistent with Section 3. Finally, to the extent any vote of Stockholders is required to effectuate the terms of this Agreement, the Stockholders agree to vote their Shares in accordance with the intention of this Agreement, but as to Stockholder matters not subject to the terms of this Agreement, each Stockholder retains his or her full discretion. To effectuate the intent of this Section 12, no vote contrary to the provisions hereof shall be recorded by the Corporation or any of its officers.[33]

The CSRA also contains an integration clause that provides that the CRSA

constitutes the entire understanding between the parties with respect to the subject matter hereof, no other representations or covenants having induced any party to enter into this Agreement. This Agreement may not be amended or modified in any matter except by a written agreement executed by all the parties hereto.[34]

24. Tr. at 33 (Carlson).

25. Tr. at 327–28 (Carlson); Tr. at 553 (Hallinan).

26. Tr. at 38 (Carlson); Tr. at 508 (Hallinan).

27. Tr. at 39 (Carlson); Tr. at 508 (Hallinan).

28. Tr. at 142 (Mickman); PX 8. The Redemption Agreement pursuant to which Hallinan bought out Mickman's interests indicates that Mickman sold his interests in TC, RAC and CR, but Mickman testified that he also sold his interest in CRA. *See* Tr. at 142. These inconsistencies notwithstanding, Mickman's involvement with Hallinan controlled payday loan companies ceased in July 1999. Revised Pretrial Stip. ¶ II.9.

29. PX 4 at GR861; Tr. at 62 (Carlson); Tr. at 504 (Hallinan).

30. PX 4 ¶ 2.

31. *Id.* ¶¶ 3–4. The position of Chairman is assigned to Hallinan in the paragraph titled "Officers"; presumably, the parties intended for him to be Chairman of the CR Board of Directors.

32. *Id.* ¶ 5.

33. *Id.* ¶ 12.

34. *Id.* ¶ 22.

The CSRA does not, however, address the compensation of directors or officers or the distribution of profits.

### D. The Termination of Carlson

Sometime in 2000, Hallinan began expressing dissatisfaction with Carlson's performance as the day-to-day manager of CR.[35] Specifically, Hallinan was concerned that the bad debt ratio at CR was higher than at TC.[36] In an apparent attempt to solve the bad debt problem by allowing others to manage CR day to day,[37] Hallinan requested, and Carlson agreed, that Carlson move to TC's offices in Bala Cynwyd one day a week.[38] Several months later, at the end of the summer of 2000, Hallinan requested that Carlson move to TC's offices full time; Carlson assented to that request.[39]

Although Carlson continued to hold the title of President of CR and receive his salary via Contact,[40] he had no involvement in CR's day-to-day operations while he was working in the Bala Cynwyd offices.[41] In fact, Carlson worked on projects that were supposed to benefit not just CR, but TC and Main Street, as well.[42] Over time,

Gordon and Hallinan became dissatisfied with Carlson's performance and "lack of contribution" at the Bala Cynwyd offices[43] and, in October 2001, Hallinan fired Carlson as President of CR.[44] Nevertheless, Carlson remained a director of CR and Contact continued to hold 30% of the stock of CR.

### E. The Books and Records Action and Carlson's Removal as a Director

On February 25, 2002, Carlson and Contact, as a director and shareholder, respectively, served on CR a demand to inspect CR's books and records pursuant to 8 *Del. C.* § 220.[45] Two days later, Hallinan, acting as Chairman of the CR Board of Directors, sent Carlson both an "Action by Partial Consent of Stockholders" and an "Unanimous Consent of Directors" (collectively, the "Consents"). The Consents purported to remove Carlson as a director of CR.[46]

On March 6, 2002, Carlson and Contact, as a director and shareholder, respectively, filed an action to inspect CR's books and records pursuant to 8 *Del C.* § 220.[47] Still,

---

35. Tr. at 535–36 (Hallinan) (testifying that he complained to Gordon); Tr. at 64 (Carlson) (testifying that Hallinan complained to him).

36. Tr. at 64. "Bad debt" or the "bad debt ratio" is the percentage of loan principal not repaid. Tr. at 96 (Carlson).

37. *See* Tr. at 275 (Carlson) (confirming that he testified in his deposition that "when [ ] Hallinan suggested that somebody else come in and run the operation on a day-to-day basis, with the idea [of] improving principally the bad debt expense, reducing the bad debt expense, I agreed to that."). Hallinan experimented with two managers at CR after Carlson and before Gordon, but neither was able to solve the bad debt problem. Tr. at 105–10 (Carlson). Gordon took over as manager of CR in early 2001. Tr. at 112 (Carlson); Tr. at 555 (Hallinan).

38. Tr. at 536–37 (Hallinan); Tr. at 103 (Carlson).

39. Tr. at 104 (Carlson); Tr. at 537–38 (Hallinan).

40. Tr. at 557 (Hallinan).

41. Tr. at 555–56 (Hallinan).

42. Tr. at 104–05 (Carlson); Tr. at 545 (Hallinan).

43. Tr. at 556 (Hallinan); *see also* Tr. at 1179–81 (Gordon).

44. Tr. at 557–58 (Hallinan).

45. Revised Pretrial Stip. ¶ II.16.

46. *Id.* ¶ 17.

47. *Id.* ¶ 18.

CR continued to refuse to provide the requested documents because Hallinan did not trust Carlson. Hallinan claimed to believe that Carlson intended to start a competing payday loan company.[48] Eventually, however, CR did provide Carlson with the requested documents, thus averting a trial. Carlson and Contact subsequently sought payment of their attorneys' fees for the Section 220 action and then, on August 1, 2002, commenced this direct and derivative action. The Court decided to coordinate consideration of the request for attorneys' fees with the resolution of the direct and derivative action. Thus, the Court will address Plaintiffs' claim for attorneys' fees for the Section 220 action in this Opinion.

### F. The Reinstatement of Carlson as a Director and the Continued Operation of CR

On November 6, 2002, Hallinan and Gordon, acting as a majority of the CR Board of Directors, reinstated Carlson as a director.[49] In March of 2003, CR held its first formal board meeting; it continued to hold such meetings into 2004.[50] Carlson participated in these meetings telephonically, but frequently voted against proposals made by Hallinan or Gordon.[51]

By late 2000, Hallinan had begun to pay himself a salary: $14,000 for the period October 1, 2000 through December 31, 2000 [52] and then $34,000 for the fiscal year ended March 31, 2001.[53] After Carlson's termination as President, Hallinan began to pay himself a significantly higher salary. For the fiscal years ended March 31, 2002, 2003 and 2004, Hallinan paid himself $429,539, $565,385 and $540,001 respectively. Gordon also drew a salary from CR of $55,846 for the fiscal year ended March 31, 2002, $80,300 for the fiscal year ended March 31, 2003 and $84,000 for the fiscal year ended March 31, 2004.[54] In addition, CR leased a vehicle for Gordon's use for a period of two years that cost $1099.52 per month.[55]

In early 2001, while it was still operating from Contact's West Chester offices, CR began paying TC a management fee of 5% of its gross revenues.[56] This fee compensated TC for services it provided to CR such as collections.[57] When CR's operations moved to TC's offices in 2002 the management fee remained 5% even though TC began providing CR with office space, office supplies and marketing services. From 2001 through 2004, CR paid $783,924 in management fees to TC.[58]

### G. CR Remains in the County Bank Program

From its creation, CR's payday loan business operated in what the parties refer

48. Tr. at 1114 (Hallinan).

49. PX 40; Revised Pretrial Stip. ¶ II.19.

50. *See* DX 1–3 (minutes of CR Board meetings).

51. *See, e.g.,* DX 1 at 2 (voting against payment of year-end bonuses to Hallinan and Gordon for their service as officers of CR); DX 2 at 2 (voting against creation of a defined benefit pension plan for the employees of CR).

52. Tr. at 173 (Stip. of the parties).

53. Revised Pretrial Stip. ¶ II.21.

54. *Id.* Gordon also receives a salary of $96,000 per year from TC. Tr. at 1172 (Gordon).

55. PX 122.

56. Tr. at 1103, 1105 (Hallinan); Revised Pretrial Stip. ¶ II.22.

57. Tr. at 1102 (Hallinan).

58. PX 80 at CR DEMAND 30 ($139,450 for the fiscal year ended March 31, 2001 ("FY01")); PX 83 at D 40 ($250,820 for FY02); PX 91 at D 1404 ($227,892 for FY03); PX 93 at CRServ 10 ($165,762 for FY04).

to as the "Bank Model."[59] Pursuant to this model, CR markets, services, processes and collects payday loans, but is not the lender.[60] County Bank, a Rehoboth Beach, Delaware bank, actually extends the loans; CR then purchases a 95% interest in the loans from County Bank.[61] The parties believe that operating pursuant to this model allows County Bank and CR to export interest rates permissible under Delaware law but not necessarily under the laws of other states to customers in other states. The parties also believe that CR is subject only to the laws of Delaware and the United States, not the laws of the states where its customers reside.[62]

In contrast to the Bank Model, payday loan companies that operate under what the parties refer to as the "Licensed Lender Model" actually lend directly to customers.[63] Licensed lenders export the interest rate of a particular state to customers in other states just like the bank and payday loan companies that operate pursuant to the Bank Model do, but, the parties believe, without the legal protections enjoyed by companies operating pursuant to the Bank Model.[64]

In January 2004, Hallinan decided to move TC and Main Street from the Bank Model to the Licensed Lender Model.[65] CR, however, remained in the Bank Model.[66] In May 2002, County Bank had made it difficult for TC and Main Street to grow because County Bank promulgated rules limiting internet advertising and limiting the number of loans a customer could have to one.[67] Although these rules limited CR's growth potential, too, Hallinan testified that he decided to keep CR in the Bank Model because Carlson would not have agreed to leave the Bank Model and because he only deemed it a reasonable risk to leave the Bank Model for the companies where he owned 100% of the shares.[68]

## H. Factual Disputes

The foregoing facts in Sections I.A through I.G are essentially undisputed. To the extent they are in dispute, the facts as recited constitute the Court's findings.

The parties do dispute, among others, facts relating to the oral agreement to form CR and the decision to maintain CR in the Bank Model. Where necessary, the

**59.** *See, e.g.,* Defs.' Opening Post–Trial Br. ("DOB") at 4–5, 19–20; Opening Post–Trial Br. of Pls. [Carlson & Contact] ("POB") at 45.

**60.** Tr. at 30 (Carlson).

**61.** Tr. at 831–33 (Gillan). David Gillan is a Vice President of County Bank and is in charge of its payday loan operations. Tr. at 828–30.

**62.** Tr. at 30–31 (Carlson); Tr. at 1123–24 (Hallinan).

**63.** Tr. at 1126–27 (Hallinan).

**64.** *Compare* Tr. at 1123 (Hallinan) ("The legality of the bank model had been tested many times, had gone as far as the Supreme Court of the United States of America, and the ability of banks to export interest rates had always been upheld.") *with* Tr. at 1127

(Hallinan) (testifying that the Licensed Lender Model is "[m]uch riskier" than the Bank Model "[b]ecause you don't have the case law. You don't have all of the legal decisions that have been made at, for instance, the Court of Appeals or the Supreme Court level, to protect you. It is significantly riskier.").

**65.** Tr. at 1130.

**66.** Tr. at 1128 (Hallinan) ("I decided to stay with the County Bank model for CR Services.").

**67.** Tr. at 1120–21; DX 31.

**68.** Tr. at 1128. *But see* Tr. at 1128–29 (Hallinan) (testifying that several other payday loan companies in which he did not own 100% of the shares also abandoned the Bank Model for the Licensed Lender Model).

Court will resolve these and other factual disputes in connection with the resolution of the accompanying legal issues.[69]

## II. DEFENDANTS' POST–TRIAL MOTION TO SUPPLEMENT THE RECORD

■ On September 20, 2005, nearly ten months after the conclusion of the trial and eleven days after post-trial argument, Defendants moved to supplement the record. They sought to introduce Axcess's 2003 and 2004 federal tax returns, an affidavit of a CPA who reviewed the 2003 return and prepared the 2004 return and an affidavit from Gordon purporting to explain the information embodied in the tax returns and offering further testimony concerning Axcess. Defendants maintain that the documents show that Axcess was not a corporate opportunity of CR because CR was not capable of pursuing the opportunity and because Axcess's foray into the payday loan business as a licensed lender ultimately proved to be unprofitable.[70] Plaintiffs opposed the motion and briefing ensued.

Two days after Defendants filed their reply in support of their Motion to Supplement, Plaintiffs sought leave to take discovery to determine whether CR, TC, Main Street and Axcess were still going concerns.[71] Plaintiffs expressed concern that Defendants were shifting assets to frustrate a potential adverse judgment by this Court.[72] Defendants opposed Plaintiffs' motion.[73]

The Court heard argument on both motions and denied Plaintiffs' request to take discovery on the record while reserving judgment on Defendants' motion. Having considered the Motion to Supplement, it is hereby DENIED.

■ A motion to supplement the record is addressed to the discretion of the trial court.[74] Among the factors the Delaware courts have considered in deciding this and similar types of motions are 1) whether the evidence has come to the moving party's knowledge since the trial,[75] 2) whether the exercise of reasonable diligence would have caused the moving party to discover the evidence for use at trial,[76] 3) whether the evidence is so material and relevant that it will likely change

---

**69.** The parties briefed a number of evidentiary disputes. Ultimately, only two disputes are relevant to the disposition of the case. The first is whether the parol evidence rule applies. The Court resolves this dispute *infra* at Section III.A.1. The second is whether Defendants' offers to settle the 220 Action are admissible to explain Defendants' actions. The Court concludes that the letters are inadmissible under DRE 408, but, even if the Court were to consider them, they would not change the Court's conclusion with respect to payment of Plaintiffs' attorneys fees incurred in prosecuting the 220 Action. The Court has not resolved any of the other evidentiary disputes because this Opinion does not rely on any of the contested.

**70.** Defs.' Post–Trial Mot. to Supplement the R. ("Motion to Supplement") ¶¶ 8, 10.

**71.** Letter from Neal C. Belgam, Esq., to the Court (Oct. 26, 2005).

**72.** *Id.*

**73.** Letter from Wheeler K. Neff, Esq., to the Court (Oct. 28, 2005).

**74.** *Fitzgerald v. Cantor*, 2000 WL 128851, at *1 (Del.Ch. Jan.10, 2000); *Daniel D. Rappa, Inc. v. Hanson*, 209 A.2d 163, 166 (Del.1965); *see also New Castle County v. Klair*, 687 A.2d 196, at *1 (Table) (Del.1996) (reviewing Superior Court's denial of a motion to supplement the record for abuse of discretion).

**75.** *Poole v. N.V. Deli Maatschappij*, 257 A.2d 241, 243 (Del.Ch.1969) (motion to reopen record to conform to appellate court's ruling).

**76.** *Id.*

the outcome,[77] 4) whether the evidence is material and not merely cumulative,[78] 5) whether the moving party has made a timely motion,[79] 6) whether undue prejudice will inure to the nonmoving party [80] and 7) considerations of judicial economy.[81] Ultimately, a motion to reopen turns on the interests of fairness and justice.[82]

In this case, the limited probative value of the evidence proffered by Defendants is far outweighed by the fact that much of the underlying information is not or should not be new to Defendants and by the undue prejudice that would inure to Plaintiffs if the Court were to consider this selective snippet of Axcess's financial information. In addition, the motion is not timely and considerations of judicial economy weigh against admission of the proffered evidence.

The disputed evidence is not without some probative value. An element of the claim of usurpation of a corporate opportunity is that the corporation be financially able to exploit the opportunity.[83] Further, such a claim will not lie if the alleged opportunity ultimately proved unsuccessful.[84] Thus, the amount of expenses incurred by Axcess in exploiting the alleged opportunity and whether Axcess successfully exploited the opportunity may be relevant in determining whether CR could have exploited it or if there even was an opportunity to exploit.

The 2003 Axcess tax return apparently was filed by September 15, 2004.[85] This document thus existed in its final form two months before trial commenced. Since the 2003 calendar year ended more than ten months before trial, the information underlying the 2003 tax return existed long before trial began.[86] Likewise, it appears that the 2004 Axcess tax return was filed by September 15, 2005.[87] Defendants presumably also knew much of the information underlying this document at the time of trial or shortly thereafter.[88] Although final numbers for 2004 were not available to Defendants until after trial, they could have compiled interim numbers for use at trial. Thus, Defendants bear the responsibility for failing to make use of that information.

**77.** *Id.*

**78.** *Id. See also Procter & Gamble Co. v. Paragon Trade Brands, Inc.,* 15 F.Supp.2d 406, 409 (D.Del.1998) (motion for a new trial or, alternatively, to alter or amend the judgment).

**79.** *Fitzgerald,* 2000 WL 128851, at *2.

**80.** *Id.; Kahn v. Tremont Corp.,* 1997 WL 689488, at *5 (Del.Ch. Oct.28, 1997) (motion to reopen record on remand after appellate court shifted burden of proof).

**81.** *Fitzgerald,* 2000 WL 128851, at *2; *Tremont Corp.,* 1997 WL 689488, at *5.

**82.** *Tremont Corp.,* 1997 WL 689488, at *5.

**83.** *McGowan v. Ferro,* 859 A.2d 1012, 1038 (Del.Ch.2004) (citing *Broz v. Cellular Info. Sys., Inc.,* 673 A.2d 148, 154–55 (Del.1996)), *aff'd,* 2005 WL 1123388 (Del. May 9, 2005).

**84.** *Id.*

**85.** *See* Mot. to Supp. Ex. A at 2.

**86.** *See* Mot. to Supp. ¶ 6 ("Financial information about Axcess from its inception in September, 2003 through June 30, 2004 was compiled in response to Plaintiffs' discovery requests and provided to Plaintiffs prior to trial.").

**87.** *See* Mot. to Supp. Ex. A at 10.

**88.** *See* Mot. to Supp. ¶ 6 ("No other financial information about Axcess was subsequently *compiled* thereafter by Defendants until the Axcess 2004 tax year corporate income tax return was prepared in 2005.") (emphasis added).

■ The information in Gordon's affidavit also was either known to Defendants before trial or shortly thereafter. Further,

> [t]he general rule is that witnesses must be examined fully and specifically as to their knowledge of all material matters in controversy; and where a witness has in fact testified at the trial, a rehearing based on evidence which could have been elicited by a proper examination will be refused except in a very strong case.[89]

Gordon testified for Defendants at length at trial. And, Defendants, despite protestations to the contrary,[90] knew or should have known that a claim for usurpation of a corporate opportunity was part of this dispute.[91] Most of the facts in Gordon's affidavit, or a suitable substitute, could have been elicited at trial by a proper examination. Thus, the Court will not allow their introduction after the fact.

Of even greater significance to the Court's decision to deny Defendants' motion is the unfair prejudice that would inure to Plaintiffs if this Court were to consider this fragment of information concerning Axcess. A corporation's tax return represents just one view among myriad others of its financial performance.

Similarly, a corporation may cease doing business for any number of reasons unrelated to its profitability. Here, Defendants, who have an obvious incentive to cherry pick information favorable to them, offer two years worth of tax returns and the testimony of Gordon while leaving Plaintiffs no realistic opportunity to counter the information contained therein with other financial information or to cross-examine the witness on these topics. Such a situation is unfairly prejudicial to Plaintiffs.[92]

The timing of the motion and considerations of judicial economy also weigh against admission. Defendants represent that Axcess ceased operations in February 2005.[93] Defendants could have moved to supplement the record with evidence of that fact and Axcess's 2004 financial information at that time. If Defendants had, Plaintiffs could have responded to the evidence in post-trial briefing and even sought some limited discovery into the matters raised by the new evidence. Instead, Defendants brought their motion after post-trial briefing and argument. Thus, Defendants' motion creates possibility of a mini-trial over the meaning of their proffered facts over a year after the trial ended.[94] Such a proceeding would waste

**89.** *Fitzgerald*, 2000 WL 128851, at *2 (quoting *Kennedy v. Emerald Coal & Coke Co.*, 42 A.2d 398 (Del.1944)).

**90.** *See* Defs.' Reply Mem. in Support of Defs.' Post–Trial Mot. to Supplement the R. at 2 ("The new evidence ... is ... relevant to Plaintiffs' corporate opportunity claim which was not specifically articulated until many months after the trial.").

**91.** *See* Revised Pretrial Stip. ¶¶ 4 (Defendants listing "[w]hether the business judgment rule or the entire fairness standard of judicial review applies to ... the retention of CR in the bank lender model as a servicer to County Bank" as an issue remaining to be litigated), 6 (Defendants listing "[w]hether any actions engaged in by Hallinan, Gordon or CR ...

would constitute ... diversion of business ... with respect to CR's operations" as an issue remaining to be litigated).

**92.** *Fitzgerald*, 2000 WL 128851, at *2 (concluding that allowing supplementation of the record would be "unfairly prejudicial to [the non-movants] in that they would now be forced to galvanize yet another major effort to gather evidence to explain their view of the inferences to be drawn from the [proffered evidence] if it were admitted").

**93.** Mot. to Supp. Ex. B.

**94.** *See Fitzgerald*, 2000 WL 128851, at *2 (noting the possibility of a " 'mini-trial' to reconcile disputed evidence with limited pro-

judicial resources. The Court already has presided over a lengthy trial of this case and reviewed extensive pre and post-trial briefing. The case is ready for decision. As such, the Court will not countenance such late, improper supplementation of the record.

For all of these reasons, the Court, in an exercise of its discretion, denies Defendants' Motion to Supplement.

## III. ANALYSIS

### A. Plaintiffs' Contract Claims[95]

Plaintiffs argue that Carlson, Hallinan and Mickman entered into an oral agreement concerning executive compensation, the distribution of CR's profits and the right of Carlson to serve as a director and an officer of CR that survived the execution of the CRSA. Plaintiffs then contend that Hallinan and Gordon's payment of executive compensation to themselves and a management fee to TC breached this oral contract. Plaintiffs also allege that the firing of Carlson as President of CR and his removal as a director of CR breached both the oral contract and the CRSA. Defendants respond by arguing that the parol evidence rule bars the admission or consideration of extrinsic evidence to modify or amend the CRSA. There can be no breach, according to Defendants, because there is no surviving oral contract.

### 1. The parol evidence rule does not bar the admission of evidence of prior agreements when the contract is not completely integrated

■ The parol evidence rule bars the admission of "preliminary negotiations, conversations and verbal agreements" when the parties' written contract represents "the entire contract between the parties."[96] If a written contract represents the entire agreement of the parties it is said to be "integrated."[97] To determine whether a writing is integrated, it

> must be looked at and if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] agreement, it is conclusively presumed that [the writing represents] the whole agreement of the parties.[98]

In other words, "[a] contract is integrated if it represents a final and complete expression of the parties' agreement."[99]

---

bative value" where such evidence was offered over five months after trial).

95. The CRSA contains a choice of law clause that provides for the application of Pennsylvania law to questions of "validity, construction, interpretation and effect" of the CRSA. PX 4 ¶ 16. Pennsylvania law therefore governs Plaintiffs' contract claims. *See J.S. Alberici Constr. Co. v. Mid–West Conveyer Co.,* 750 A.2d 518, 520 (Del.2000) ("Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction.") (internal citation omitted); *Hills Stores Co. v. Bozic,* 769 A.2d 88, 112 (Del.Ch.2000) (respecting choice of law clause in a contract where corporate party to the contract was headquartered in chosen state and employee parties to the contract performed the bulk of their services in the chosen state).

96. *Yocca v. Pittsburgh Steelers Sports, Inc.,* 578 Pa. 479, 854 A.2d 425, 436 (2004) (internal citations and quotations omitted).

97. II E. Allan Farnsworth, *Farnsworth on Contracts* § 7.3 at 225 (3d ed.2004) [hereinafter *Farnsworth on Contracts* ].

98. *Yocca,* 854 A.2d at 436 (internal citations and quotations omitted).

99. *Lenzi v. Hahnemann Univ.,* 445 Pa.Super. 187, 664 A.2d 1375, 1379 (1995).

The presence of an integration clause in a contract is "a clear sign that the writing is meant to be [the parties' entire agreement]" [100] and "make[s] the parol evidence rule particularly applicable." [101] The presence of an integration clause is not conclusive, however, because the intent of the parties always controls. [102]

■ Here, the intent of the parties was to create a partially integrated agreement. A partially integrated agreement is a "final expression of the terms it contains," but is not "a complete and exclusive statement of all terms on which agreement was reached." [103] The integration clause makes clear that the CRSA is a final expression of the terms contained therein and thus an integrated contract, while the surrounding circumstances [104] make clear that the CRSA is not completely integrated. Hallinan admitted that he, Carlson and Mickman entered into an agreement concerning Carlson's compensation as President of CR. [105] The CRSA does not address Carlson's executive compensation; in fact, it does not address executive compensation at all. Further, Hallinan admitted that the agreement on Carlson's compensation survived the execution of the CRSA. [106] The CRSA is thus only partially integrated. [107]

■ When there is a partially integrated writing, the parol evidence rule applies with respect to the terms contained in the writing, but does not apply to terms not contained therein. [108] Thus, the question for the Court is what are the terms of the surviving oral agreement.

100. *Id.*

101. *McGuire v. Schneider, Inc.*, 368 Pa.Super. 344, 534 A.2d 115, 117 (1987).

102. *See Lenzi*, 664 A.2d at 1379 (affirming trial court's decision to allow testimony concerning the intent of the parties even though the contract at issue contained an integration clause); *Greenberg v. Tomlin*, 816 F.Supp. 1039, 1053 (E.D.Pa.1993) ("the mere presence or absence of an integration clause is not necessarily dispositive" on the question of integration under Pennsylvania law).

103. II *Farnsworth on Contracts* § 7.3 at 226.

104. The Court may consider extrinsic evidence to determine if the contract is completely or partially integrated. *See* II *Farnsworth on Contracts* § 7.3 at 231 ("According to Corbin, account should always be taken of all circumstances, including evidence of prior negotiations, since the completeness and exclusivity of the writing cannot be determined except in the light of those circumstances. The writing cannot prove its own completeness and accuracy. The trend clearly favors Corbin. The Restatement Second commentary agrees that a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties.") (internal citations and quotations omitted).

105. Tr. at 508.

106. Tr. at 509.

107. *See Greenberg*, 816 F.Supp. at 1052 ("[A]n exception to the rule exists [under Pennsylvania law] when the party seeking to enforce the agreement as written has made admissions that the agreement does not, in fact, constitute the entire agreement between the parties even when it contains an integration clause.") (internal citations omitted).

108. *See id.; see also McGuire*, 534 A.2d at 117 (observing that "[a]lleged prior or contemporaneous oral representations or agreements concerning subjects that are *specifically dealt with* in the written contract are merged in or superseded by that contract"); *Blumenstock v. Gibson*, 811 A.2d 1029, 1035 (Pa.Super.2002) (same); *DiPalma v. LaLiberte*, 1996 WL 480729, at *2 (E.D.Pa. Aug.16, 1996) ("A court may also receive parol evidence [under Pennsylvania law] ... if the written agreement was not intended to constitute the parties' entire understanding.") (internal citation omitted).

## 2. The surviving oral agreement[109]

■ ' "The burden is on the plaintiff to prove by a preponderance of the evidence the existence of the contract to which the defendant is a party.' " [110] Three elements are necessary to prove the existence of an enforceable contract: 1) the intent of the parties to be bound by it, 2) sufficiently definite terms and 3) consideration.[111] Where, as here, Plaintiffs seek to prove the existence of an oral contract, they "must prove that the contract was clear and precise." [112] "[W]hen construing an oral contract the words constituting the agreement are merely parts of and imbedded in a general conversation, and the meaning must be interpreted with reference to the circumstances under which the parties contracted in light of the objectives to be accomplished." [113] Further, "courts must look to surrounding circumstances and course of dealing between the parties in order to ascertain their intent." [114]

## a. Executive compensation and the distribution of CR's profits

■ Plaintiffs argue that in addition to agreeing on Carlson's salary, Carlson, Hallinan and Mickman agreed that there would be no other officer compensation and that distributions from CR would be made on a *pro rata* basis only. Defendants deny the occurrence of any such discussions, and thus the existence of any agreement, between Carlson, Hallinan and Mickman concerning the salaries of anyone besides Carlson or the distribution of CR's profits. The Court finds that Plaintiffs have met their burden of proving the existence of an oral agreement providing that the directors and officers of CR would receive no compensation other than Carlson's monthly salary and that CR's stockholders would receive only *pro rata* distributions.[115] The evidence is as follows.

109. Pennsylvania law also governs the construction of the oral contract. In the absence of a choice of law provision, the contacts relevant to determining which states' law applies to issues sounding in contract are 1) the place of contracting, 2) the place of negotiation of the contract, 3) the place of performance, 4) the location of the subject matter of the contract, and 5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Shook & Fletcher Asbestos Settlement Trust v. Safety Natl. Cas. Corp.*, 2005 WL 2436193, at *3 (Del.Super.Sept.29, 2005). With the lone exception of the place of incorporation of CR, all of these factors favor the application of Pennsylvania law. *See Candlewood Timber Group LLC v. Pan Am. Energy LLC*, 2003 WL 22417235, at *4 n. 30 (Del.Ch. Oct.22, 2003) (applying Argentine law to contract claims where place of contracting, negotiation, performance and subject matter of contract were in Argentina), *rev'd on other grounds*, 859 A.2d 989 (Del.2004).

110. *Johnston the Florist, Inc. v. TEDCO Constr. Co.*, 441 Pa.Super. 281, 657 A.2d 511, 516 (1995) (quoting *Viso v. Werner*, 471 Pa. 42, 369 A.2d 1185, 1187 (1977)).

111. *Id.*

112. *Edmondson v. Zetusky*, 674 A.2d 760, 764 (Pa.Commw.Ct.1996) (citing *Suravitz v. Prudential Ins. Co.*, 261 Pa. 390, 104 A. 754 (1918)).

113. *Boyle v. Steiman*, 429 Pa.Super. 1, 631 A.2d 1025, 1033 (1993) (internal citation omitted).

114. *Id.* (internal citations omitted). *See also Greene v. Oliver Realty, Inc.*, 363 Pa.Super. 534, 526 A.2d 1192, 1194 (1987) ("in cases involving oral contracts the complete agreement is not recorded. Therefore, in that situation, courts must always examine the surrounding circumstances to determine the parties['] intent.").

115. Plaintiffs argue that the payment of management fees to TC somehow breached this agreement, but presented scant evidence that Carlson, Mickman and Hallinan ever even discussed the issue of management fees. Plaintiffs half-heartedly argue that the management fees were just disguised compensation to Hallinan, but the Court finds that the

Carlson testified that "[i]t was specifically understood and agreed that no other compensation would be received by any of the other shareholders, whether in the form of salary, bonuses, or any other matter; that, in fact, the profits were to be distributed to the individuals according to their ownership in the company." [116] Mickman, a disinterested witness, corroborated Carlson's testimony. According to Mickman, he entered into an agreement with Carlson and Hallinan exactly as Carlson described.[117] Plaintiffs thus proved sufficiently definite terms of the agreement as to executive compensation and distributions.

Plaintiffs also proved intent to be bound by the agreement by providing credible evidence that the parties acted in accordance with its terms. Carlson testified that during the first year of CR's operation he received his $11,000 per month salary, while no other salaries were paid or distributions made.[118] With one exception,

Defendants did not offer any evidence to the contrary.[119]

Finally, Plaintiffs proved the existence of consideration. In return for his salary and position, Carlson contributed his time and the resources of Contact.[120] Hallinan contributed his knowledge of the industry, his time and CR's working capital,[121] while Mickman contributed his experience in and knowledge of the industry.[122]

The circumstances surrounding the formation of this oral agreement corroborate the agreement's terms. In the summer of 1999, Hallinan and nonparty Stanton Myerson discussed the formation of Main Street. At a meeting with Carlson and Hallinan, Myerson testified, Hallinan told him that Main Street would be similar to CR "in that officers were not going to be compensated." [123] Further, Hallinan, Myerson and a third party did, in fact, enter into an agreement embodying the same terms as the agreement among Carlson, Hallinan and Mickman.[124]

plain meaning of the words compensation and distributions does not encompass payment for necessary services provided to CR, even if they were provided by a Hallinan owned entity. As such, the Court concludes that there was no agreement precluding management fees and thus no breach of contract by Hallinan in that regard.

**116.** Tr. at 39–40.

**117.** Tr. at 138–39 ("We weren't going to be taking any money out ... we weren't allowed to take any money out for salaries. [Carlson] was the only one taking a salary. We couldn't take any money out of the business unless at a given time when there was enough money for distributions to be made, we would have to sit down and then discuss how much we were taking, and then we would each get our appropriate share for whatever our percentage was.").

**118.** Tr. at 73–74.

**119.** Hallinan took a salary for the last three months of 2001. Nevertheless, the Court concludes that this does not negate the parties'

intent to be bound by the oral agreement because it did not occur until some one and one half years after the parties entered into the agreement.

**120.** Tr. at 139 (Mickman) ("when [Carlson] came into the company, he put Contact Results—he really almost gave up his entire business to go into the business"), 156–57 (same).

**121.** Tr. at 40–42 (Carlson) ("one of the reasons Hallinan got 55 percent was because he was providing the working capital for the company to fund these loans").

**122.** Tr. at 42 (Carlson).

**123.** Tr. at 806.

**124.** PX 10. *See also* Tr. at 811–12 (Myerson) (testifying that he understood the Main Street Stockholders' Agreement to provide for *the pro rata* distribution of profits and that officers of Main Street were not going to receive compensation).

In stark contrast to the cogent and consistent testimony of Carlson and Mickman, Hallinan testified that he, Carlson and Mickman never discussed how CR would distribute profits [125] or the compensation of officers.[126] The Court finds Hallinan's testimony on these topics not credible in light of Hallinan's discussions with Myerson concerning the arrangement at CR and Mickman's disinterested testimony to the contrary. Further, the Court finds it unlikely that three experienced businessmen would have gone into business together without at least discussing these topics.

In summary, the Court finds that Carlson, Hallinan and Mickman entered into an enforceable oral agreement concerning the payment of executive compensation at CR and the distribution of profits. In addition, the Court finds that the agreement survived the execution of the CRSA.

■■■■■ Carlson also proved that Hallinan breached the oral agreement. Besides proof of the existence of a contract, a claim of breach of contract requires a violation of a duty imposed by that contract and damages flowing from the violation.[127] Hallinan's payment of a salary to himself and to Gordon violated the contractually imposed duty not to pay directors or officers a salary. Plaintiffs suffered damages as a result of this violation because the money paid to Hallinan and Gordon as salary was not available for *pro rata* distribution to CR's stockholders. Hallinan is thus liable for breach of the oral agreement that formed CR.[128]

### b. Carlson's positions as President and a director of CR

Plaintiffs next argue that Carlson, Mickman and Hallinan orally agreed that Carlson would be the President and a director of CR for life and that the CRSA reduced to writing this aspect of the oral agreement. According to Plaintiffs, therefore, Hallinan breached both the oral agreement and the CRSA, and Gordon breached the CRSA, by firing Carlson as President of CR and by removing him as a director. Defendants respond that the parol evidence rule bars admission of any prior agreement on the subject of Carlson's role as President and a director of CR and that the CRSA does not provide that Carlson shall be President for life. Defendants admit that Carlson effectively has a permanent right to be a director of CR,[129] but argue that he suffered no damages as a result of his brief removal from the board.

### i. The removal of Carlson as President

■■■■■ The Court's conclusion that the CRSA is partially integrated bars admission or consideration of any prior oral agreement concerning Carlson's service as President and as a director of CR. When contracting parties have reduced their agreement on a particular subject to writing, "the intent of the parties is the writing

---

**125.** Tr. at 511 ("There was never a discussion as to how profits would be distributed ....").

**126.** Tr. at 637 ("We didn't talk about officer compensation; therefore, we didn't talk about limiting officer compensation other than [] Carlson's compensation.").

**127.** *Buckeye Ret. Co. v. Lloyd,* 2005 WL 2267067, at *2 (Pa.C.P. Sept. 1, 2005) (citing *CoreStates Bank Nat'l Ass'n v. Cutillo,* 723 A.2d 1053 (Pa.Super.1999)).

**128.** Gordon was not a party to the oral agreement and there is no evidence that he ever became one. As such, he cannot be liable for breach of that agreement. The Court will address the remedy for this and other breaches *infra,* Section III.E.

**129.** Tr. at 631 (Hallinan); *see also* DOB at 42 ("although Hallinan and Gordon ... *purported* to remove Carlson as a director of CR") (emphasis added).

itself." [130] "When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself." [131] In ascertaining the intent of the parties, "the words of a contract are to be given their ordinary meaning." [132] A court may only resort to extrinsic evidence to ascertain the meaning of the contract if it is ambiguous. [133] "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." [134] A contract is not ambiguous, however, "merely because the parties do not agree on its construction." [135]

■ The CRSA provides that "the officers of the Corporation shall be ... President: G. William Carlson." [136] The CRSA does not state, however, that Carlson shall be the permanent president of CR or the President "for life." In fact, the CRSA simply says that Carlson shall be the President. In the absence of any words expressing an intent to make Carlson's appointment permanent, the Court concludes that the CRSA unambiguously provides that Carlson shall be the President of CR until the duly elected CR Board of Directors decides otherwise.

■ The Court's conclusion that the plain language of the CRSA does not evince an intent to make Carlson's appointment as President permanent finds support in both employment and corporate law. In employment law, there is a strong presumption against permanent positions. In fact, this presumption is so strong that "it usually is not rebutted by an agreement which specifies that it is for 'permanent' or 'lifetime' employment." [137] Rather, "a clear and definite intention to overcome the presumption [of at will employment] must be expressed in the contract." [138] Where, as here, the CRSA does nothing more than indicate that Carlson "shall be" the President with no mention of a term or of permanency, there is no reason to believe the parties intended to make Carlson the President permanently.

Similarly, in corporate law, the election of officers is generally left to the board of directors. [139] It is a basic presumption of corporate law that the initial officers are just that: initial, subject to later change, even if they are named as officers in the corporation's organic documents. [140] If the

130. *Kripp v. Kripp*, 578 Pa. 82, 849 A.2d 1159, 1163 (2004).

131. *Id.*

132. *Id.*

133. *RegScan, Inc. v. Con–Way Transp. Servs., Inc.*, 875 A.2d 332, 337 (Pa.Super.2005).

134. *Kripp*, 849 A.2d at 1163.

135. *J.W.S. Delavau, Inc. v. E. Am. Transport & Warehous., Inc.*, 810 A.2d 672, 681 (Pa.Super.2002) (internal quotation omitted).

136. PX 4 ¶ 4.

137. *Greene*, 526 A.2d at 1196; *Grose v. Procter & Gamble Paper Prods.*, 866 A.2d 437, 441 (Pa.Super.2005) ("A promise of 'permanent'

or 'lifetime' employment is generally insufficient to rebut the presumption of at will employment.") (internal quotation omitted).

138. *Grose*, 866 A.2d at 441.

139. *See* 8 *Del. C.* § 142(b) ("Officers shall be chosen in such manner and shall hold their offices for such terms as are prescribed by the bylaws or determined by the board of directors or other governing body. Each officer shall hold office until such officer's successor is elected and qualified or until such officer's earlier resignation or removal."); PX 121 ¶ 5.02 (Bylaws of CR Services Corp.) ("The officers of the corporation ... shall be elected annually by the board of directors ....").

140. *See* Rodman Ward, Jr., *et al.,* I *Folk on the Delaware General Corporation Law* § 142.5 at GCL–IV–187 (4th ed.2006) [herein-

parties to a contract forming a Delaware corporation intend to depart from this default, they must do so explicitly. Paragraph four of the CRSA does not sufficiently evidence an intent to depart from this norm.[141]

In an attempt to save their breach argument, Plaintiffs contend that because the parties to the CRSA may only modify it by "written agreement executed by all the parties hereto,"[142] it was a breach of the CRSA to fire Carlson and "modify" the agreement without Carlson's written consent. This argument is not persuasive. The requirement of unanimous written consent to modify a written agreement is a standard contractual provision. Yet, Plaintiffs attempt to bootstrap this standard provision to support an argument that is contrary to traditional employment and corporate law, *i.e.*, that the parties intended Carlson to be the President of CR for life. The plain language of the document does not support such a reading.[143] Nor is there anything inconsistent between the requirement of unanimous consent for modification and the Court's previous conclusion that the CRSA does not provide that Carlson shall be President permanently.

Accordingly, the Court concludes that Carlson's position as President was not permanent and that the majority of the CR Board had the authority to remove him. Hallinan and Gordon, therefore, did not breach the CRSA when they terminated Carlson as President.

### ii. The temporary removal of Carlson as a director

▬▬ Hallinan and Gordon did violate the CRSA, however, when they removed Carlson as a director. Paragraph twelve of the CRSA provides that "[e]ach Stockholder agrees to vote all Shares for the election of directors in a manner consistent with Section 3."[144] Section (or paragraph) three of the CRSA provides that Carlson shall be a director of CR. The plain import of these two provisions is that the parties to the CRSA may only remove a CR director who is identified in paragraph three, such as Carlson, by unanimous agreement. Hallinan and Gordon did not have Carlson's consent when they purported to remove him as a director.

Plaintiffs have thus proved two of the three elements required for a claim of breach of contract: 1) the existence of a

after *Folk on the DGCL*] ("In the absence of an employment agreement for a term, officers have no vested right to their office and serve at the pleasure of the body empowered to replace or remove them.").

141. Even if Carlson, Hallinan and Gordon had agreed that Carlson would be President of CR for life, such a provision may run afoul of 8 *Del. C.* § 141(a), which provides that "[t]he business and affairs of every corporation ... shall be managed by or under the direction of a board of directors...." Such a provision may also run afoul of 8 *Del. C.* § 142(b), which provides that an officer "shall hold office until such officer's successor is elected and qualified or until such officer's earlier resignation or removal." *See Folk on the DGCL* § 142.5 at GCL–IV–187 ("The board of directors may hire an officer

for a term running beyond the election of a new board, but such a contract is not good unless the term is of reasonable duration."). For purposes of this Opinion, the Court need not reach these questions.

142. PX 4 ¶ 22.

143. The provisions of the CRSA relating to the identity of CR's directors provide further support for this conclusion. As explained in Section III.A.2.ii, *infra*, CRSA paragraphs three and twelve effectively require the unanimous consent of all CR stockholders to remove Carlson as a director. There are no explicit provisions imposing a similar restriction on the CR Board's ability to remove Carlson as President.

144. PX 4 ¶ 12.

contract and 2) a violation of a duty imposed by said contract.[145] Plaintiffs have not proven, however, that any damages resulted from the violation, the third required element of a breach of contract claim. Carlson was not a director of CR for a little more than eight months.[146] He did not lose any income for that period because CR directors are not compensated. Plaintiffs also failed to prove any actions or failures to act during the period Carlson was not on the board for which his absence proximately caused him damage.[147] Thus, Plaintiffs' claim for breach of the CRSA based on the removal of Carlson as a director of CR fails.

## B. Plaintiffs' Fiduciary Duty Claims

Plaintiffs argue that Hallinan and Gordon breached their fiduciary duties to CR and Contact as a minority stockholder by paying themselves executive compensation, authorizing CR to pay a management fee to TC, causing CR to bear certain expenses incurred by other Hallinan owned entities, usurping a corporate opportunity of CR's and firing Carlson as President and removing him as a director of CR.

Plaintiffs argue, and Defendants do not dispute, that the entire fairness standard applies to Hallinan and Gordon's decisions to pay themselves executive compensation and to authorize CR to pay a management fee to TC. The Court will address the alleged breaches of fiduciary duties seriatim.

### 1. The entire fairness standard and its relation to Hallinan and Gordon's decisions to pay themselves executive compensation and to cause CR to pay a management fee to TC

■ "It is a well-settled principle of Delaware law that where directors stand on both sides of a transaction, they have 'the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.'"[148] Hallinan and Gordon were on both sides of the decision to cause CR to pay them executive compensation.[149] Similarly, Hallinan was on both sides of the decision to cause CR to pay a management fee to TC, a company he wholly owns.[150] Gordon did not stand

145. *Buckeye Ret. Co.*, 2005 WL 2267067, at *2 (citing *CoreStates Bank Nat'l Ass'n*, 723 A.2d 1053).

146. Revised Pretrial Stip. ¶¶ 17, 19.

147. To the extent that any of the actions leading to a finding of breach of contract or fiduciary duties occurred during this period, relief from the resultant damages is provided for in connection with the relevant breach of contract or of fiduciary duty.

148. *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 898 (Del.Ch.1999) (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (1983)); *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993) ("When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.... The requirement of fairness is unflinching ....") (quoting *Weinberger*, 457 A.2d at 710).

149. *See Nixon*, 626 A.2d at 1376 (holding that director defendants were on both sides of the decisions to create an employee stock ownership plan ("ESOP") and purchase key man life insurance for themselves because they "benefited from the ESOP and could have benefited from the key man life insurance beyond that which benefited other stockholders generally"); I *Folk on the DGCL* § 141.2 at GCL–IV–50 ("[I]t has been held that, where directors have voted themselves stock options and thereby appear on both sides of the transaction, they assume the burden of proving their utmost good faith and the most scrupulous inherent fairness of the bargain.") (citing cases).

150. *See Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *16 (Del.Ch. May 31, 2000) (holding that directors were on both sides of transaction and entire fairness applied where directors caused money to be

on both sides of the decision to cause CR to pay TC a management fee and thus was not interested in that decision. Regardless, unless Gordon was independent for purposes of that decision, he, too, is required to prove that it was entirely fair.[151]

■ "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[152] "Such extraneous considerations or influences may exist when the challenged director is controlled by another.... This lack of independence can be shown when a plaintiff [proves] that the director[ is] beholden to [the controlling person] or so under their influence that their discretion would be sterilized."[153]

■ Gordon is an employee of CR and TC, both of which Mailman controls, and has been an employee of Hallinan since 1986.[154] He effectively depends on Hallinan for his livelihood. Further, Gordon admittedly has approved everything proposed by Hallinan.[155] Although Gordon

hesitatingly testified that he did not simply acquiesce to Hallinan's requests,[156] the Court does not find his testimony credible. The Court concludes that Gordon is not independent and, more critically, that he failed to act independently as to the various transactions challenged by Plaintiffs. Thus, his decisions are not entitled to the presumption of the business judgment rule and Gordon, too, must establish the entire fairness of the challenged transactions.[157] As such, Hallinan and Gordon bore the burden of establishing the entire fairness of their salaries and the management fee paid to TC by a preponderance of the evidence.

■ The Director Defendants argue that because they, as a majority of the CR stockholders ratified the challenged transactions, the burden shifts to Plaintiffs to prove that the transactions were not entirely fair.[158] The Director Defendants misapply Delaware law. To have any effect, stockholder ratification must be by a majority of the disinterested and fully informed stockholders.[159] Here, the shares

paid from a Delaware corporation to themselves and to entities they controlled).

**151.** *See Orman v. Cullman,* 794 A.2d 5, 22 (Del.Ch.2002) ("[T]he business judgment rule presumption that a board acted loyally can be rebutted by [establishing] that the board was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders.") (emphasis eliminated).

**152.** *Aronson v. Lewis,* 473 A.2d 805, 816 (Del. 1984).

**153.** *Orman,* 794 A.2d at 24 (internal quotation omitted).

**154.** Tr. at 1167–69 (Gordon).

**155.** *See, e.g.,* Tr. at 1208–09 (testifying that he never asked any questions about how Hallinan determined the numbers in his executive compensation proposals and that he never failed to approve a proposal Hallinan made),

1221 (testifying that he and Hallinan determined the amount of the management fee, but being impeached by deposition testimony that he had no idea how the fee was determined, Hallinan made the decision to impose the fee and he had no role in it).

**156.** *See, e.g.,* Tr. at 1178.

**157.** *Emerald Partners v. Berlin,* 787 A.2d 85, 91 (Del.2001) ("If the presumption of the business judgment rule is rebutted ... the burden shifts to the director defendants to prove to the *trier of fact* that the challenged transaction was 'entirely fair' to the shareholder plaintiff") (internal citations omitted).

**158.** DOB at 27–28; *see also* DX 2 ("Agenda Item III: Ratification of Board and Management Actions").

**159.** *Harbor Fin. Partners v. Huizenga,* 751 A.2d 879, 900 (Del.Ch.1999) ("Only votes controlled by stockholders who are not 'interest-

voting to ratify Hallinan and Gordon's actions were held by Hallinan and Gordon themselves.[160] Only Carlson, assuming he was fully informed, could have voted through Contact as a majority of the disinterested stockholders to ratify Hallinan and Gordon's actions. Because there was no evidence of such a vote by Contact, the purported ratification was ineffective.

## 2. Executive compensation

 Entire fairness has two components: fair dealing and fair price.[161] " 'Fair dealing' focuses on the actual conduct of corporate fiduciaries in effecting a transaction, such as its initiation, structure, and negotiation." [162] "Fair price includes all relevant factors 'relat[ing] to the economic and financial considerations of the proposed [transaction].' "[163] "In making a determination as to the entire fairness of a transaction, the Court does not focus on one component over the other, but examines all aspects of the issue as a whole." [164] "[T]he question is one of *entire* fairness." [165]

### a. Fair dealing

The record adduced at trial reflects an utter lack of meaningful process in the determination of Hallinan's and Gordon's salaries. Hallinan initiated the compensation transactions and determined the amount of compensation to be paid, while Gordon acquiesced without any discussion or negotiation.[166] From the formation of CR until the trial of this case, this lack of process took three forms, none of which satisfies the fair dealing component of entire fairness.

In the context of evaluating the entire fairness of a proposed asset sale, this Court held that

> [d]irectors must make an 'informed, deliberate judgment, in good faith,' that the transaction is fair and not a 'vehicle for economic oppression.' In addition, directors are required to disclose all material facts concerning the transaction so that an informed decision can be made as to whether or not a transaction should be approved.[167]

---

ed' in the transaction at issue are eligible for ratification effect.... That is, only the votes of those stockholders with *no* economic incentive to approve a wasteful transaction count."); *Solomon v. Armstrong*, 747 A.2d 1098, 1115–17 (Del.Ch.1999) ("[S]hareholder ratification by a majority of the disinterested shareholders acts as a safe harbor in situations where directors' potentially conflicting self-interests are at issue.... [I]n the context of a duty of loyalty claim where plaintiff minority shareholders can state a claim of self-dealing at their expense, an *informed shareholder ratification* by the minority shifts the burden of proof of entire fairness to the plaintiff."), *aff'd*, 746 A.2d 277 (Del.2000).

160. DX 2 at 4 ("Carlson voted against such [ratification] motion."). Apart from Carlson's company, Contact, the only other stockholders were Hallinan and Gordon.

161. *Weinberger*, 457 A.2d at 711.

162. I *Folk on the DGCL* § 141.2 at GCL–IV–49.

163. *Solar Cells, Inc. v. True N. Partners, LLC*, 2002 WL 749163, at *5 (Del.Ch. Apr.25, 2002) (quoting *Weinberger*, 457 A.2d at 711).

164. *Boyer*, 754 A.2d at 898–99 (citing *Weinberger*, 457 A.2d at 711).

165. *Weinberger*, 457 A.2d at 711 (emphasis added).

166. Tr. at 1208–09 (Gordon) (testifying that Hallinan determined the amount of his and Gordon's compensation, that he did not ask Hallinan any questions with respect to his determination of the amounts and that he approved all of Hallinan's compensation proposals).

167. *Boyer*, 754 A.2d at 899 (quoting *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1335 (Del.Ch.1987)).

These requirements apply in the nonmerger context, as well.[168]

The record contains conflicting testimony over whether the directors of CR ever formally considered the payment of executive compensation to Hallinan in 2000 and to Hallinan and Gordon in 2001.[169] The evidence does show, however, that Hallinan determined that he should start receiving a salary and he did, in fact, start receiving an amount of his choosing as salary.[170] Thus, rather than showing that the directors of CR made an informed, deliberate judgment concerning the payment of executive compensation for 2000 and 2001, the Director Defendants have shown the opposite. Further, Hallinan and Gordon have failed to show that they disclosed the material facts necessary to make these decisions to Carlson or even to one another. As Hallinan testified, the determination of the amount of compensation "was arbitrary to a great extent." [171]

For compensation decisions made between Carlson's ouster from the Presidency in late 2001 and the beginning of formal board meetings in 2003, the Director Defendants provided almost no evidence of how they determined their compensation. In fact, the only evidence is Gordon's general testimony that Hallinan proposed compensation and he approved Hallinan's proposals without discussion.[172] There is no evidence that Carlson, the only independent director in this context, received any information necessary to make these decisions or participated in them. Thus, with respect to the decisions to pay themselves compensation during the period from October 2001 through March 2003, Hallinan and Gordon have failed to prove that they engaged in any process, much less a fair process.

Finally, for compensation decisions made after CR began holding formal board meetings in 2003, the Director Defendants argue that they "were duly presented as agenda items at the year end Board meetings in March 2003 and March 2004 . . . . [and were] approved as presented by Hallinan and Gordon acting collectively as a majority of the Board." [173]

While it may be true that the procedures employed by the defendants complied with the mechanical requirements of . . . Delaware law[ ] for calling a meeting of directors, that hardly is sufficient to show the procedural fairness of the transaction. Nor does the fact that the transaction was approved by a ma-

---

**168.** *See Nixon,* 626 A.2d at 1376 (quoting *Weinberger* for the proposition that fair dealing embraces questions of how the transaction was disclosed to directors and how directors' approval was obtained); I *Folk on the DGCL* § 141.2 at GCL–IV–49 ("This element [of fair dealing] also embraces the duty of candor owed by corporate fiduciaries to disclose all material information relevant to corporate decisions from which they may derive a personal benefit.").

**169.** *Compare* Tr. at 171–75 (Carlson) (testifying that he learned of Hallinan's 2000 and 2001 compensation after the fact and that he objected to it only one time because Hallinan "made it very clear the first time around that he was going to do it because he wanted to do it. And that was it.") *with* Tr. at 1088–94 (Hallinan) (testifying that he, Carlson and Gordon discussed Hallinan and Gordon's salaries and that Carlson was not happy but did not object).

**170.** Tr. at 1088 (Hallinan) ("I was spending more time with [CR], and I thought I should get compensated, so it was discussed in an informal way."), 1091–92 (testifying that there was no real discussion concerning his increased compensation in 2001 even though Carlson was not happy that he was receiving compensation).

**171.** Tr. at 1094.

**172.** *See supra* n. 155.

**173.** DOB at 35–36.

jority of the Board of Directors or a majority of the stockholders establish fairness, as every vote in favor was cast by an interested person.[174]

Gordon testified that he did not know what factors went into determining his and Hallinan's compensation.[175] Hallinan testified simply that he was spending more time with CR and thus believed he should receive more compensation.[176] Further, the minutes of the CR Board meetings do not reflect any discussions of compensation proposals. Rather, the minutes record a presentation by Gordon to the effect that CR could afford to pay the proposed compensation and a vote to approve the proposals by Hallinan and Gordon.[177] Once again, the Director Defendants have not shown that they engaged in a fair process to determine their compensation. Thus, Hallinan and Gordon have failed to show that any of the decisions to pay themselves executive compensation were the product of fair dealing.

### b. Fair price

The Director Defendants also failed to prove that the amount of compensation was fair.

Hallinan and Gordon proffered the report and testimony of Richard S. Proctor ("Proctor")[178] as an expert witness on their compensation. Proctor opined that Hallinan functions as CR's CEO, COO and CFO, while Gordon functions as CR's Controller and top administrative executive.[179] Proctor relied in part on information he obtained from www.salary.com on the salaries of persons in similar positions at other financial services companies in the Philadelphia area with annual revenues of $50 million or less.[180] After combining the salaries of persons serving in the positions Hallinan and Gordon held, Proctor reported that Gordon's compensation fell at the low end of the data he obtained, while Hallinan's fell within "the 25% percentile [sic] and Median compensation data."[181] He concluded that Hallinan and Gordon's salaries "are not inconsistent with industry practices and salary ranges for other companies in the financial services industry."[182]

Proctor's opinion is of little use to the Court in determining whether the Director Defendants' salaries were entirely fair to CR. First, Proctor did not account for the major difference between CR and the supposedly comparable companies from which he obtained compensation data, namely, that CR never had more than $4 million in annual revenue.[183] Second, Proctor cited no authority for simply combining the sala-

---

174. *Boyer,* 754 A.2d at 900.

175. Tr. at 1207–08.

176. Tr. at 1099–1100.

177. *See, e.g.,* DX 1 (Minutes of March 27, 2003 meeting of the CR Board) (Gordon provided a "financial overview report" and then Hallinan and Gordon voted themselves year-end bonuses).

178. Proctor is a CPA, a Certified Valuation Analyst and Professor of Accounting at the Ancell School of Business at Western Connecticut State University. DX 5 at 16.

179. *Id.* at 11–12.

180. *Id.* at 13.

181. *Id.* at 14.

182. *Id.*

183. *Id.* at 8; Tr. at 995 (Proctor) (admitting that he made no adjustments for the fact that CR's revenue was significantly less than $50 million per year). Proctor also made no attempt to verify the data provided by www.salary.com and had no knowledge of what companies data www.salary.com aggregated to reach its numbers or even how many companies' data was aggregated. Tr. at 995 (Proctor).

ries of multiple positions and using the combined numbers as benchmarks. In fact, Proctor admitted that whether someone holding multiple positions would receive multiple, independent salaries would depend on the "facts and circumstances" of the situation. Yet, he could cite neither facts nor circumstances justifying such a combined payment in this case.[184] Indeed, Proctor did not cite any example of such combining of salaries ever being done. Finally, Proctor did not consider the amount of time Hallinan and Gordon devoted to CR in an absolute sense or relative to the time they spent working for Mailman's other payday loan companies.[185]

Hallinan and Gordon also testified on the fairness of their compensation, but their testimony falls far short of establishing that it was entirely fair to CR. Hallinan testified about what he does for CR and how much time he spends doing it, but his testimony, in fact, shed little light on either of these subjects. For example, Hallinan testified that he provides "general oversight and management" to CR, TC, Main Street and Axcess.[186] He also provides some management services to, at least, companies called First East and NM,[187] but was unable to state how much time he spends working for each company.[188] Similarly, Gordon could not state how he split his time between CR, TC and Main Street.[189] The Director Defendants

also made no attempt to explain why CR also pays two other employees to manage CR when Gordon supposedly manages CR and gets paid for doing so.[190]

Ultimately, the Director Defendants provided no credible testimony that their compensation was appropriate in light of CR's economic and financial circumstances. Hallinan and Gordon thus failed to satisfy their burden of showing that the prices of the challenged decisions were entirely fair. The Court thus concludes that Hallinan and Gordon failed to satisfy the requirement of entire fairness to CR and therefore breached their fiduciary duties to CR by paying themselves the executive compensation they did.[191]

### 3. Management fee

For purposes of evaluating whether the Director Defendants' decisions to cause CR to pay management fees were the result of a fair process, the Court divides the decisions into two groups. The first group includes the decisions made before CR held formal board meetings, while the second group includes the decisions made while CR held formal board meetings. The record adduced at trial by the Director Defendants reflects a complete lack of process with respect to decisions in the first group and a lack of a meaningful

**184.** Tr. at 100102.

**185.** Tr. at 973, 984

**186.** Tr. at 695–98.

**187.** Tr. at 700.

**188.** Tr. at 696.

**189.** To the extent that the Director Defendants argue that Hallinan's compensation is fair because he deserves an "entrepreneurial premium," the Court observes that Hallinan received a risk-appropriate return of 24% per

annum on the money he loaned CR and would have received a risk-appropriate return on his 65% interest in CR if CR had distributed profits *pro rata,* pursuant to the oral agreement forming the company.

**190.** *See* Tr. at 1203 (Gordon) (testifying that both Taylor and a Gene Gennaro are paid to manage CR).

**191.** The Court's determination that Hallinan breached his fiduciary duties by paying himself a salary provides an independent, alternative ground for requiring Hallinan to repay his salary to CR.

process with respect to decisions in the second group.

■ Hallinan testified that before CR held formal board meetings, "we all" agreed upon the payment of a management fee.[192] Presumably, he meant he, Carlson and Gordon agreed.[193] In response to the very next question, Hallinan testified that Carlson "never expressed that there should not be a management fee."[194] This testimony leaves the Court unsure whether Carlson ever participated in any decision to pay a management fee. Moreover, Carlson denied having any such involvement and testified that he only learned of the imposition of the fee after the fact.[195]

Gordon initially testified at trial that he had a role in the decision to pay a management fee, but was impeached by his deposition testimony that he believed Hallinan made that decision and that he had no role in it.[196] The Court finds Gordon's trial testimony not credible in part because it contradicts his deposition testimony and because it was exceedingly general and vague with respect to what actually happened.[197] The Court therefore finds that the Director Defendants failed to engage in a fair process with respect to the payment of a management fee before the beginning of formal CR Board meetings in March 2003.

The Director Defendants argue that they engaged in a fair process as to the management fee once CR began holding formal board meetings because "the management fee was an agenda item and discussed and debated among all directors and approved by a majority of the directors."[198] As in the case of executive compensation, the fact that Hallinan and Gordon held a properly noticed meeting to vote on a self-dealing transaction does not, in and of itself, establish the procedural fairness of the transaction. Further, the minutes of the CR Board meetings do not reflect any (re)consideration of the "somewhat arbitrary number" that was the management fee percentage, even though TC began providing significantly more services for CR when CR moved its operations to TC's offices. The Director Defendants thus have failed to show that the imposition and continuation of the management fee was the result of a fair process.[199]

---

192. Tr. at 1105.

193. The Director Defendants argue in their brief that the "[m]anagement fee first paid in March 2001 was discussed and initially agreed to by all directors," DOB at 30, but provide no citation to the record. After an exhaustive review of the record, the Court finds that Hallinan's one instance of self-serving testimony is the only shred of evidence supporting this contention.

194. Tr. at 1105.

195. Tr. at 204 (testifying that he believed the management fee was applied retroactively).

196. Tr. at 1220–21.

197. *Compare* Tr. at 1220 ("[W]e discussed the [management fee] together and determined that that amount was appropriate.") *with* Tr. at 1220–21 (responding to the question, "Isn't it true that you had no part in determining the management fee?" with the answer "No. Because it was really based on what we had done with Main Street Services. So, you know, we did have some part in it.").

198. DOB at 30.

199. Although the use of an independent committee of directors or the hiring of outside experts is not a prerequisite to a finding that a transaction was the result of a fair process, the Court notes that the Director Defendants did not use either of these procedures even though the courts of Delaware "have recognize[d] the utility of independent committees in a variety of fact patterns." I *Folk on the DGCL* § 141.2 at GCL–IV–58 (internal citation omitted); *see also In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531 (Del.Ch.2003)

Hallinan and Gordon did present some evidence that the management fee price was fair. To wit, the fee that CR paid to TC is the same as the fee Main Street paid to TC.[200] Further, the fee paid by Main Street was negotiated by an independent party (Myerson), not imposed by an interested person (Hallinan). The comparison is worth only so much to the Director Defendants. TC provided Main Street significantly more services than it provided to CR.[201] For example, the management fee Main Street paid TC provided for the services of Hallinan and Gordon whereas Hallinan and Gordon decided to cause CR to pay them a salary in addition to imposing a management fee on CR.[202]

Hallinan did testify credibly concerning the variety of goods and services that TC provides CR,[203] but the Director Defendants made no attempt to quantify the value of those goods and services or to show the relation between them and the management fee. Further, the constancy of the management fee irrespective of the changes in the services provided by TC suggests that the management fee was

arbitrary; in fact, Hallinan admitted as much.[204]

Although the Director Defendants presented some limited evidence that the management fee represented a fair price for the goods and services provided by TC, they failed to meet their burden that the price was entirely fair to CR. Further, Hallinan and Gordon's utter failure to demonstrate that the management fee was the result of a fair process causes the Court to conclude that the management fee was not entirely fair to CR. Hallinan and Gordon thus breached their fiduciary duties to CR by causing it to pay a management fee to TC.

**4. Expenses of other Hallinan entities**

Plaintiffs argue, citing specific examples, that Hallinan and Gordon caused CR to bear the expenses of other Hallinan entities, namely Main Street, TC and Axcess, and breached their fiduciaries duties in doing so. Plaintiffs ask this Court to order an accounting at Defendants' expense to determine the exact amount of misallocated expenses.

---

(finding a merger involving a controlling shareholder entirely fair where the board appointed a committee of independent directors to negotiate the deal and it retained outside advisers).

**200.** *See* PX 9 at GR 001926 (Management Services Agreement) (providing for payment from Main Street to TC of 5% of Main Street's net revenues, "defined to mean gross revenue less bad debt expense"); *cf.* Tr. at 1105 (Hallinan) (testifying that CR paid a management fee of "five percent of their revenues" without specifying whether he meant gross revenue or gross revenue less bad debt expense); DOB at 31 ("5% management fee of CR is identical to the 5% management fee paid by Main Street to TC for similar services").

**201.** Tr. at 806 (Myerson) (explaining that TC managed Main Street for a fee); Tr. at 206–07

(Carlson) (explaining differences in services provided by TC to CR versus Main Street); Tr. at 1223 (Gordon) (testifying that Main Street has no in-house management because TC manages it). *Compare* PX 52 (CR expenses) *with* PX 54 (Main Street expenses).

**202.** Tr. at 1225 (Gordon) (admitting that part of what CR gets for the management fee is the services Gordon provides as the manager of CR); *cf.* Tr. at 1101 (Hallinan) ("[Gordon] and I are providing executive oversight so to speak. The management fees are intended to reimburse TC for the nonexecutive services that we offer.").

**203.** Tr. at 1102–05 (testifying that TC did CR's collections work and provided it with office supplies).

**204.** Tr. at 1105 ("It is a somewhat arbitrary number . . . .").

 "Corporate officers and directors, like all fiduciaries, have the burden of showing that they dealt properly with corporate funds and other assets entrusted to their care." [205] Where, as in this case, "fiduciaries exercise exclusive power to control the disposition of corporate funds and their exercise is challenged by a beneficiary, the fiduciaries have a duty to account for the disposition of those funds, *i.e.*, to establish the purpose, amount and propriety of the disbursements." [206]

 Hallinan and Gordon exercise exclusive control over CR's funds.[207] Plaintiffs demonstrated that an employee of CR, Jason Taylor, does work for CR, TC, Main Street and Axcess, but CR alone pays his salary.[208] Plaintiffs also demonstrated that CR paid for the development of web sites that benefited CR, TC and

Main Street.[209] Defendants made no attempt to explain why these and other expenses were not properly allocated to the entities that benefited from them. Further, Gordon admitted that as the controller of CR and TC, he cataloged expenses incurred by TC for CR and billed CR for those expenses, but never documented expenses incurred by CR on behalf of TC or on behalf of any Hallinan owned entities.[210]

In light of Plaintiffs' showing of definite instances where Defendants did not properly allocate expenses among Hallinan owned or controlled entities and CR and Gordon's admission that he did not even keep track of expenses incurred by CR on behalf of other Hallinan entities, the Court concludes that an accounting is necessary[211] to determine the extent of the misallocation of expenses and the damages resulting therefrom.[212]

205. *Technicorp Int'l II*, 2000 WL 713750, at *16; Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate & Commercial Practice in the Delaware Court of Chancery* (2005) § 12–6[a] [hereinafter *Wolfe & Pittenger*] ("It has long been recognized that fiduciaries, because they hold property or exercise power for another, are required to account in chancery for their stewardship.") (internal quotation omitted).

206. *Technicorp Int'l II*, 2000 WL 713750, at *16 (internal citation omitted).

207. *See* Tr. at 1139 (Hallinan) (testifying that he ordered Gordon to stop providing Carlson with CR's financial information); Tr. at 1176 (Gordon) (testifying that he got Hallinan's permission to allocate expenses to CR), 1231 (testifying that he was responsible for receiving and paying invoices).

208. Tr. at 1362–63 (Taylor) (testifying that he is CR's director of operations and TC's chief information officer and performs services for Main Street and Axcess, although CR pays his salary); Tr. at 1227 (Gordon) (testifying that Taylor works for CR, TC, Main Street and Axcess but is paid only by CR).

209. Tr. at 230–32 (Carlson). *Compare* PX 52 (CR's expenses) *with* PX 53–54 (TC and Main Street's expenses).

210. Tr. at 1226–27.

211. *Cf. Pan Am. Trade & Inv. Corp. v. Commercial Metals Co.*, 94 A.2d 700, 701 (Del.Ch. 1953) (equity will take jurisdiction in an action for an accounting where 1) there are mutual accounts between the parties, 2) the accounts are held by one side and "there are circumstances of great complication" and 3) a fiduciary relationship exists among the parties and the defendants have a duty to render an accounting). All three of these elements are present here. *See also Wolfe & Pittenger* § 12–6[a] "[A]n accounting may be an appropriate remedy for breach of fiduciary duty by a corporate director or officer, for example, where ... the fiduciary has directed corporate funds to his or her benefit or has personally profited from the improper use of corporate property....").

212. In addition to determining the extent of the misallocated expenses, the accountant shall also determine whether Hallinan and Gordon paid themselves a salary or caused CR to pay a management fee after March 31, 2004. To the extent the Director Defendants did either, they may be jointly and severally liable to CR for those additional amounts.

### 5. Usurpation of a corporate opportunity

Plaintiffs argue that the Director Defendants' failure to move CR from the Bank Model to the Licensed Lender Model when Hallinan moved his other payday loan companies to the Licensed Lender Model constitutes usurpation of a corporate opportunity. Plaintiffs further argue that the Director Defendants breached their fiduciary duties to CR by failing to move CR to the Licensed Lender Model and by diverting CR's business to Hallinan's other payday loan companies. The Director Defendants respond that Plaintiffs failed to satisfy their burden of proof on all four elements of a usurpation claim and, alternatively, that under *Thorpe v. CERBCO, Inc.*[213] they cannot be held liable because they could have prevented any decision to switch to the Licensed Lender Model because they held a majority of CR's stock. The Director Defendants also contend that Plaintiffs failed to prove damages with respect to this claim.

In the typical corporate opportunity case, only one entity may take advantage of the opportunity, *i.e.*, if A buys the property or merges with C then B cannot buy the same property or merge with C.[214] This case involves a different situation; there was not only one or a limited number of Licensed Lender Model opportunities. Main Street, TC and Axcess could move to the Licensed Lender Model without excluding CR from doing so. In fact, what Hallinan did with his other payday loan companies is relevant only insofar as it sheds light on what he thought of the Licensed Lender Model.[215] What is most relevant is how Hallinan and Gordon, as fiduciaries of CR, acted with respect to the question of whether CR should become a licensed lender. Thus, the proper framework for evaluating Hallinan's and Gordon's actions with respect to the decision to leave CR in the Bank Model is the typical duty of loyalty analysis.[216]

Hallinan's and Gordon's actions in connection with their decision to leave CR in the Bank Model strongly suggest that that decision "was not taken in an honest attempt to foster the corporation's welfare,"[217] but rather reflected a certain indifference or an unwillingness to consider even prudent increases in risk as to CR, because it involved a shared ownership with Carlson. Hallinan testified that "it was becoming increasingly difficult[] to grow the business, even maintain the business, in the County Bank program."[218] Yet, Hallinan deemed the move to the Licensed Lender Model an unacceptable

213. 676 A.2d 436 (Del.1996).

214. *See, e.g., Guth v. Loft,* 5 A.2d 503 (Del. 1939) (opportunity to invest in bankrupt Pepsi–Cola Company); *Broz,* 673 A.2d 148 (opportunity to purchase a specific license from the Federal Communications Commission).

215. *Cf. Ferro,* 859 A.2d at 1039 (holding that directors' decision to pursue an opportunity the board had rejected but not include plaintiff did not constitute usurpation of a corporate opportunity; directors were under no obligation to include other director in the new venture).

216. Because the corporate opportunity framework *is* not the appropriate framework through which to review the Director Defendants' actions, it is not necessary to address their alternative defense to the usurpation of a corporate opportunity claim based on *Thorpe v. CERBCO, Inc.*

217. I *Folk on the DGCL* § 141.2 at GCL–IV–34.1 ("[O]ne who seeks to visit liability upon a director for injury suffered by the corporation as a result of an act of an independent board must prove that the act was grossly negligent or was not taken in an honest attempt to foster the corporation's welfare.").

218. Tr. at 1120.

risk for CR.[219] At the same time, he deemed the move an appropriate risk for all of his other payday loan companies.[220] Such testimony strikes the Court as an ex post attempt to explain disloyal actions. In fact, after noting that he did not believe Carlson would want to leave the Bank Model,[221] Hallinan admitted that he never even discussed the opportunity to leave the Bank Model with Carlson because he "didn't think it was appropriate at the time to discuss it with him" and "had no obligation to discuss or disclose that to [] Carlson."[222] Further support for the Court's skepticism about Hallinan's explanation comes from the fact that Hallinan and Gordon decided to cease phone book advertising, CR's only real remaining source of new customers, at a time when CR had no other viable alternative.[223] If CR was not, as Plaintiffs contend, left to die on the vine, it certainly was hamstrung and likely to stagnate.

■ These actions by Gordon and especially by Hallinan may constitute a breach of the duty of loyalty,[224] but the Court need not and does not reach this issue because Plaintiffs did not prove resultant damages. Plaintiffs argue, based on very limited data, that the damage to CR can be quantified by examining the amount of growth of some of Hallinan's other payday loan companies.[225] Plaintiffs invite the Court to infer that because historically the volume of CR's active loans totaled 47% of TC's active loans, and Main Street's active loans totaled 52% of CR's, the relative volumes of the active loans of CR, TC and Main Street would remain at those ratios indefinitely. Plaintiffs thus ask this Court to find that CR was damaged in the amount of TC's and Main Street's growth. Plaintiffs also argue that CR was damaged in the amount of Axcess's growth. Plaintiffs did not, however, prove that remaining in the Bank Model actually damaged CR in these amounts. Remaining in the Bank Model likely damaged CR, but not necessarily in the amount of TC's, Main Street's and Axcess's growth. Plaintiffs presented no evidence that the growth at TC, Main Street and CR would have been the same or that CR successfully could make the transition from the Bank Model to the Licensed Lender Model. Further, the ratios of historical performance of three different companies operating with varying business models are no guarantee of future performance. Even though they were in the same line of business, the four companies were different businesses with different advertising emphases and different capital structures.[226]

**219.** Tr. at 1128; *see also* Tr. at 1255 (Gordon) (testifying that moving to the Licensed Lender Model would put CR "at an increased regulatory risk" and that he believed that County Bank's internet policies would negatively affect the growth of CR and all of Hallinan's payday loan companies).

**220.** Tr. at 1128.

**221.** Tr. at 1127–28.

**222.** Tr. at 1157–58.

**223.** Tr. at 1041–43 (Hallinan). The new County Bank program had made continued use of internet advertising too costly.

**224.** *See In re Emerging Commc'n S'holders Litig.*, 2004 WL 1305745, at *39 n. 184 (Del. Ch. May 3, 2004) (observing that it is unclear whether a duty of loyalty violation requires a self-dealing conflict of interest).

**225.** POB at 42–45.

**226.** *See Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati*, 1996 WL 506906, at *20 (Del.Ch. Sept.3, 1996) (finding a damages claim not based on a reasonable estimate when it was "based on assumptions about industry averages and [ ] not linked specifically to the alleged acts of gross mismanagement or gross negligence").

■ Further, Plaintiffs' estimates are far too speculative.[227] Although "mathematical certainty" is not required to award damages,[228] Plaintiffs have failed even to provide the Court with a basis for a reasonable estimate of monetary damages. However, "where, as is true here, issues of loyalty are involved, potentially harsher rules come into play. Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly.... The strict imposition of penalties under Delaware law are designed to discourage disloyalty." [229] Plaintiffs claim for breach of fiduciary duties in connection with the decision to leave CR in the Bank Model fails, in part, for failure to prove money damages. As discussed *infra* at Section III.E., however, the Court does find it appropriate to take Hallinan's and Gordon's seemingly disloyal actions into account in deciding whether CR should be dissolved.[230]

### 6. The ouster of Carlson

■ Plaintiffs argue that in firing Carlson as President of CR and temporarily removing him from the CR Board of directors, Hallinan and Gordon breached their fiduciary duties to CR. Plaintiffs cite no case in support of this novel argument.

■ The decision to remove an officer is a business judgment to which the presumptions of the business judgment rule attach absent gross negligence or proof that the action was not taken in an honest attempt to foster the corporation's welfare.[231] Plaintiffs did not prove that Hallinan or Gordon was grossly negligent or that Carlson's firing was not an attempt to foster CR's welfare.[232] Thus, Plaintiffs have failed to rebut the presumptions of the business judgment rule. Plaintiffs also failed to articulate what damages flowed proximately to CR from Carlson's firing. Similarly, Plaintiffs failed to prove that any damages flowed proximately to CR as a result of Carlson's temporary removal as a director.[233] As such, Plaintiffs have neither articulated a theory as to how Carlson's removal as President and temporary removal as a director of CR could be a breach of fiduciary duty nor proved any such breach.

### C. CR's Payment of the Director Defendants' Defense of this Action

Plaintiffs argue that Hallinan and Gordon did not properly secure advance indemnity from CR, and thus CR's payment

227. See *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del.Ch. Oct.29, 1993) ("[C]ourts will not award damages which require speculation as to the value of unknown future transactions.").

228. *Id.*

229. *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del.Ch.1999) (internal quotation omitted).

230. *Id.* ( [T]he Court's 'powers are complete to fashion any form of *equitable* and monetary relief as may be appropriate ....' ") (emphasis added) (quoting *Weinberger*, 457 A.2d at 714).

231. See *In re Walt Disney Co., Derivative Litig.*, 907 A.2d 693, 2005 WL 2056651, at *50–

51 (concluding that CEO exercised business judgment in deciding to fire President of company).

232. In the Court's opinion, the evidence indicated that Carlson was not effective in the role of President of CR and that he had important managerial shortcomings. Thus, firing him could have fostered CR's welfare.

233. Again, to the extent that any of the actions leading to a finding of breach of contract or fiduciary duties occurred during this period, relief from the resultant damages is provided for in connection with the relevant breach of contract or of fiduciary duty.

of their defense of this action is *ultra vires*. Plaintiffs further argue that the Director Defendants breached the fiduciary duties they owed CR by authorizing CR to pay for their defense.

Delaware corporations may advance litigation expenses to directors "upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized by [Section 145]."[234] CR's bylaws track the language of Section 145 and thus require an undertaking before CR may advance expenses.[235]

 It is undisputed that Hallinan and Gordon provided no written undertaking to CR. Section 145(e), however,

> leaves to the business judgment of the board the task of determining whether the undertaking proffered in all of the circumstances, is sufficient to protect the corporation's interest in repayment and whether, ultimately, advancement of expenses would on balance be likely to promote the corporation's interests.[236]

The Director Defendants argue that

> [s]ince Hallinan and Gordon [ ] comprise a majority of the CR Board that would field such a request, such an undertaking of reimbursement of CR can be presumed from CR's actual advancement of such expenses under these circumstances to be a commitment by Hallinan and Gordon to reimburse CR if it is ultimately determined that they are not entitled to be indemnified by CR.[237]

In other words, the Director Defendants argue that their undertaking was implicit. Although it may be best practice to obtain a written and secured undertaking, it is not required by Delaware law. All that is required is that the board secure such an undertaking in some form. If a board of directors is satisfied, in an exercise of its business judgment, that an oral undertaking is sufficient then this Court will not interfere with that decision. Based on the evidence here, however, the Court finds that Hallinan and Gordon never even considered an undertaking and made no decision to accept an implicit one. The presumptions and protection of the business judgment rule cannot attach to such a nondecision. Further, such a nondecision cannot satisfy the requirements of Section 145. Therefore, the Court concludes that CR's payment of Hallinan and Gordon's expenses for the defense of this action was *ultra vires*.

Plaintiffs' argument that the Director Defendants breached their fiduciary duties in causing CR to pay for their defense of this action appears, to the Court, to be nothing more than a different way of saying that Hallinan and Gordon are not entitled to indemnification because they did not act in good faith.[238] Plaintiffs correctly argue that Delaware law allows indemnification of directors and officers only upon a determination "that the person acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation."[239] Further, 8 *Del. C.* § 145(b) prohibits indemnification of di-

---

234. 8 *Del. C.* § 145(e).

235. PX 121 ¶ 7.05.

236. *Advanced Mining Sys., Inc. v. Fricke*, 623 A.2d 82, 84 (Del.Ch.1992).

237. Defs.' Answering Post–Trial Br. ("DAB") at 36.

238. *See* POB at 50 ("Hallinan and Gordon are not entitled to be indemnified for litigation expenses incurred in defending this action.").

239. *Wolfe & Pittenger* § 8–2[a]; 8 *Del. C.* § 145(a)-(b).

rectors and officers if such persons "shall have been adjudged to be liable to the corporation." Therefore, Section 145(b) provides an independent, alternative basis requiring Hallinan and Gordon to repay to CR all funds it expended in defense of this action.[240]

## D. Aiding and Abetting

■ Plaintiffs argue that Main Street and TC aided and abetted Hallinan's and Gordon's breaches of fiduciary duties. Plaintiffs do not, however, specify which breaches Main Street and TC aided and abetted.

■ There are four elements of a claim for aiding and abetting a breach of fiduciary duty: 1) the existence of a fiduciary relationship; 2) a breach of an associated fiduciary duty; 3) knowing participating in the breach by a defendant who is not a fiduciary; and 4) damages proximately caused by the breach.[241] Plaintiffs have established the existence of a fiduciary relationship between Hallinan and Gordon and CR, and between Hallinan, as the majority shareholder, and Contact, as a minority shareholder, and several breaches of the resultant fiduciary duties. Plaintiffs also have established knowing participation by TC in the payment of the management fee and the misallocation of expenses; similarly Plaintiffs have established knowing participation by Main Street in the misallocation of expenses.

Defendants argue that there can be no claim for aiding and abetting because such a claim, like a claim for civil conspiracy, requires two or more persons.[242] Defendants are correct in so far as they are arguing that a claim for aiding and abetting requires participation by a nonfiduciary defendant. Here, both Main Street and TC are nonfiduciary defendants and independent legal entities[243] capable of aiding and abetting. They satisfy the knowing participation element of the claim because Hallinan's knowledge as a director and officer of both Main Street and TC[244] is imputed to them.[245]

Finally, as the Court has already held, damages to CR flowed proximately from the relevant breaches. As such, Main Street and TC are liable to CR for aiding and abetting certain of the Director Defendants' breaches of fiduciary duties.

## E. Dissolution and Relief

Plaintiffs seek the dissolution of CR and the appointment of a custodian or receiver to wind up the affairs of the company and distribute its assets. Defendants respond that such a drastic remedy is inappropriate in this case.

240. Hallinan and Gordon may apply to this Court, pursuant to 8 *Del. C.* § 145(b), for indemnification, but, in light of the extensive findings of wrongdoing and liability, it is unlikely the Court would find "in view of all the circumstances of the case, such person[s are] fairly and reasonably entitled to indemnity. . . ." 8 *Del. C.* § 145(b).

241. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del.2001) (internal quotation and citations omitted).

242. DOB at 43.

243. Although Hallinan controlled both Main Street and TC, both are independent legal entities when dealing with Hallinan in his capacity as a director of CR.

244. Tr. at 472–73 (Hallinan).

245. *See In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 n. 22 (Del.Ch.2003) (noting general rule that knowledge of a director or officer is imputed to the corporation); 18A Am.Jur.2d *Corporations* § 1444 (knowledge of individuals at a certain level within a corporation will be imputed to the corporation).

■ This Court may order the dissolution of a solvent company and the appointment of a custodian or receiver "only upon a showing of gross mismanagement, positive misconduct by corporate officers, breach of trust, or extreme circumstances showing imminent danger of great loss to the corporation which, otherwise, cannot be prevented."[246] The Court exercises this power to dissolve a solvent corporation with "great restraint"[247] and only upon a "strong showing."[248] "Mere dissension among corporate stockholders seldom, if ever, justifies the appointment of a receiver for a solvent corporation. The minority's remedy is withdrawal from the corporate enterprise by the sale of its stock."[249]

■ The facts and circumstances here, however, comprise the very rare case where the appointment of a receiver and the dissolution of a solvent corporation is necessary. Hallinan has repeatedly breached the corporation's organizing oral agreement. Hallinan and Gordon have repeatedly breached their fiduciary duties in a continuing effort to enrich themselves at the corporation's and Plaintiff Contact's expense. Hallinan and Gordon also have prevented Carlson from having any meaningful role in the oversight of CR despite his position as a director.[250] The CR Board meetings are mere formalities designed to cloak Hallinan and Gordon's self-dealing with the sheen of legality. Hallinan and Gordon also have demonstrated that they have little interest in continuing to grow CR or even attempting to take the necessary actions to maintain it as a viable business. In fact, their actions appear designed to stifle CR out of spite towards Carlson. Without the appointment of a receiver to wind up CR's affairs, the Court concludes that Hallinan and Gordon will continue to breach the duties they owe CR and thus cause further harm to the corporation and Plaintiffs.[251] Carlson, as one director among three, and Contact, as a 30% shareholder in a corporation with a 65% shareholder, lack the power to prevent such harm.

Further unique circumstances justify the dissolution of CR. Carlson, Hallinan and Gordon have demonstrated an inability to work together towards the common good of CR. Indeed, Hallinan testified that there were times when he and Carlson simply did not speak to each other.[252] The Court's finding of liability and ordering of an accounting will only serve to exacerbate this untenable situation. Thus, this is no ordinary case of "mere dissension among

---

246. *Chapman v. Fluorodynamics, Inc.,* 1970 WL 806, at *4 (Del.Ch.1970) (internal quotation omitted).

247. *Id.* (internal quotation omitted).

248. *Tansey v. Oil Producing Royalties, Inc.,* 133 A.2d 141, 146 (Del.Ch.1957).

249. *Hall v. John S. Isaacs & Sons Farms, Inc.,* 163 A.2d 288, 293 (Del. Ch.1960).

250. *See Theodora Holding Corp. v. Henderson,* 257 A.2d 398, 406 (Del.Ch.1969) ("It is plain, we think, that for a court to order dissolution or liquidation of a solvent corporation, the proponents must show ... *a fraudulent disregard of the minority's rights,* or some other

fact which indicates an imminent danger of great loss resulting from fraudulent or absolute mismanagement.") (internal quotation omitted) (emphasis added).

251. *Cf. Lichens Co. v. Standard Commercial Tobacco Co.,* 40 A.2d 447, 452 (Del.Ch.1944) (declining to appoint a receiver for a solvent corporation where misconduct occurred between four and fourteen years ago and plaintiff only had "mere apprehension of future misconduct").

252. *See* Tr. at 1129 ("I was not ... speaking to ▢ Carlson on a regular basis at that time...."), 1158 ("I don't have to disclose anything to ▢ Carlson ... until I deem it to be the proper time to discuss it with him.").

the stockholders."[253] Rather, this is a case of fundamental discord among the only three directors and shareholders of a corporation where two of them have repeatedly breached the fiduciary duties they owe the corporation and a minority stockholder.

Pursuant to its inherent powers,[254] the Court orders the appointment of a receiver for CR. The receiver shall, subject to the Court's oversight and approval of his or her actions, arrange for the orderly wind-up of CR's business, the liquidation of CR's assets, and, after Hallinan and Gordon pay the damages ordered paid in this Opinion and any future order in this case, the distribution of the remaining assets of CR to Contact, Hallinan and Gordon in accordance with their respective ownership interests.[255]

Before dissolution, Hallinan shall repay to CR his and Gordon's salaries as damages for breach of the oral agreement to form CR.[256] This payment by Hallinan will afford Plaintiffs full relief with respect to both their executive compensation contract claims and their executive compensation fiduciary duty claims. Thus, no further relief for the breach of fiduciary duties by Hallinan and Gordon with respect to their compensation is necessary.[257]

Hallinan, Gordon and TC are jointly and severally liable for breach of fiduciary duties for CR's payment of a management fee to TC and shall repay to CR all money paid as a management fee. Hallinan and Gordon shall also repay to CR all money advanced to them for the defense of this action as a remedy for CR's void act. All payments shall be made with interest at the legal rate [258] in effect at the end of the CR quarter in which the relevant payments were made.[259] The interest shall run from the end of the CR quarter in which the relevant payments were made until payment is made in full and be compounded quarterly.[260]

253. *Cf. Wolfe & Pittenger* § 8–11[d] ("mere dissension among the stockholders will seldom, if ever, justify the appointment of a receiver for a solvent corporation.").

254. *Wolfe & Pittenger* § 8–11[d] at n. 149.

255. Counsel shall confer and agree on a mutually acceptable person to perform the aforementioned accounting and a mutually acceptable receiver for CR. Plaintiffs' counsel shall incorporate this agreement into the proposed implementing order to be submitted to this Court posthaste. If the parties are unable to agree, counsel should so inform the Court at the time Plaintiffs' counsel submits their proposed order and provide any suggestions as to how the Court should select a person to perform the accounting and a receiver.

256. Although Carlson asserted the breach of contract claims, the proper remedy is for Hallinan to repay his and Gordon's salary to CR. The breached agreement did not provide for payment of this money directly to Carlson, but rather for its *pro rata* distribution among CR's stockholders. The repayment of this money to CR is consistent with Plaintiffs' request, *see* POB at 2, and will allow for the

effectuation of the parties' intent, *i.e.*, the *pro rata* distribution of CR's profits.

257. In the event that Hallinan does not repay to CR the full amount of his and Gordon's salaries, he and Gordon are jointly and severally liable on the breach of fiduciary duty claim for the amount of their salaries determined to be over and above the fair value of the services they provided CR. The Court need not address such contingencies now, however, or attempt to make such calculations.

258. The legal rate is 5% over the relevant Federal Reserve discount rate. 6 *Del. C.* § 2301.

259. *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del.1988) ("A successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues.") (internal citation omitted).

260. *One Va. Ave. Condominium Ass'n of Owners v. Reed*, 2005 WL 1924195, at *15 (Del.Ch. Aug.8, 2005) ("[T]he interest award should be

## F. Plaintiffs' Attorneys' Fees for the Section 220 Action

Plaintiffs request payment of the attorneys' fees they incurred in prosecuting their action to obtain documents under 8 *Del. C.* § 220 pursuant to the bad faith exception to the American Rule. Plaintiffs also request fees on fees, *i.e.*, the attorneys' fees they incurred in bringing this action for fees.

■■■■ This Court has broad discretion to award attorneys' fees.[261] Normally, however, parties bear their own attorneys' fees pursuant to the American Rule.[262]

> An exception exists in equity ... when it appears that a party, or its counsel, has proceeded in bad faith, has acted vexatiously, or has relied on misrepresentations of fact or law in connection with advancing a claim in litigation. There is not a single standard of bad faith that gives rise to an award of attorneys' fees; rather, bad faith turns on the particular facts of each case.[263]

"A subset of this 'bad faith' exception is that attorneys' fees may be awarded if it is shown that the defendant's conduct forced the plaintiff to file suit to secure a clearly defined and established right."[264] "This Court does not invoke the bad faith exception lightly and imposes the stringent evidentiary burden of producing clear evidence of bad faith conduct on the party seeking an award of fees."[265] Thus, if Carlson or Contact had a clearly established right to inspect CR's books and records and Plaintiffs have shown by clear evidence that Hallinan or Gordon acted in subjective bad faith in refusing Plaintiffs' inspection demand, then the culpable Director Defendant will be liable to Plaintiffs for their attorneys' fees in the Section 220 action. Plaintiffs have made the requisite showing.

■■■ "[A] director who has a proper purpose is entitled to virtually unfettered access to the books and records of the corporation."[266] Defendants do not dispute that Carlson had a proper purpose when he requested inspection of CR's book and records to determine, *inter alia*, whether Hallinan and Gordon had breached their fiduciary duties to CR and to fulfill his own obligations as a director.[267]

---

compounded quarterly because the legal rate of interest most nearly resembles the return on a bond, which typically compounds quarterly.") (internal quotation omitted).

261. *Wolfe & Pittenger* § 13–3; *Acierno v. Goldstein*, 2005 WL 3111993, at *2 (Del.Ch. Nov.16, 2005) (citing 10 *Del. C* § 5106 and *RGC Int'l Investors, LDC v. Greka Energy Corp.*, 2001 WL 984689, at *19 (Del.Ch. Aug.22, 2001)).

262. *McNeil v. McNeil*, 798 A.2d 503, 514 (Del. 2002).

263. *Acierno*, 2005 WL 3111993, at *2 (internal quotations omitted).

264. *McGowan v. Empress Entm't Inc.*, 791 A.2d 1, 4 (Del.Ch.2000).

265. *Acierno*, 2005 WL 3111993, at *2 (internal citations omitted).

266. *Empress Entm't* 791 A.2d at 5.

267. *Carlson v. CR Servs. Corp.*, C.A. No. 19466–NC (Del. Ch. Mar. 7, 2002) [hereinafter *220 Action* ] (Compl.¶ 20). Even if Carlson had some proper and some improper purposes, he still had a right to inspect CR's books and records. *See Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del.2002) ("Once a stockholder establishes a proper purpose under § 220, the right to relief will not be defeated by the fact that the stockholder may have secondary purposes that are improper."). This proposition applies with even greater force in the context of a director seeking books and records because "access to corporate books and records is fundamentally important to the performance of the director's fiduciary duties...." *Wolfe & Pittenger* § 8–6[a].

They also do not dispute that Carlson was a director when he made his request and admitted at trial that Carlson could not be removed as a director without his consent.[268] Carlson thus had a clear right to inspect CR's books and records, and Hallinan and Gordon were very likely aware he had that right.[269] Hallinan and Gordon's attempt to remove Carlson as a director of CR two days after he formally requested documents from CR pursuant to Section 220 amounts to a bad faith attempt to deny Carlson something to which he clearly was entitled.[270] By refusing both Carlson's informal requests for CR's documents [271] and purporting to remove him as a director of CR, Hallinan and Gordon forced Carlson to file suit to vindicate a clearly established right.[272]

The Director Defendants argue that they had a right to remove Carlson as a director because he had threatened to start a competing payday loan company in violation of his covenant not to compete with CR.[273] This argument is a makeweight. First, Defendants failed to prove any actions by Carlson that might rise to the level of a breach of contract.[274] Fur-

ther, Defendants provided no time frame for Carlson's alleged comments and failed to prove that his removal was proximately related to these comments. Second, based on the timing of Carlson's removal as a director, the Court finds that Defendants' flimsy argument that they had a basis to remove Carlson for cause was invented *post hoc* to justify Hallinan and Gordon's attempt to deny him his inspection rights.

The Court therefore concludes that the Director Defendants are liable to Plaintiffs for their reasonable attorneys' fees for the Section 220 action, but not for the fees Plaintiffs incurred in prosecuting this action for those fees. The Director Defendants' opposition to Plaintiffs' request for attorneys' fees was not egregious or in bad faith and thus does not justify an award of fees on fees.[275]

## G. Plaintiffs' Attorneys' Fees for this Action

■ Another exception to the American Rule is the common fund doctrine. Pursuant to this doctrine, "a plaintiff is entitled to reimbursement for counsel fees

**268.** Tr. at 689 (Hallinan).

**269.** *See* Tr. at 689 (Hallinan) (testifying that he consulted with legal counsel before removing Carlson).

**270.** *See 220 Action* (Answer ¶ 28) ("Plaintiff Carlson is not a director of CR Services and therefore cannot request inspection under 8 Del. C. § 220(c).").

**271.** *See* Tr. at 1111–14 (Hallinan) (testifying that Carlson requested books and records of CR in January 2002).

**272.** *See Empress Entm't* 791 A.2d at 5 (finding that a corporation acted in bad faith in denying a director the right to inspect the corporation's books and records by falsely promising the director it would produce the requested books and records and forcing the director to file suit when it did not).

**273.** DOB at 48. The Director Defendants cite Carlson's history of self-dealing while he worked at CR as another reason for removing him as a director. *Id.* At trial, however, the Director Defendants presented no evidence of any such self-dealing.

**274.** Hallinan testified that Carlson "mentioned a couple of times when he was unhappy that perhaps he would consider starting his own company at some point." Tr. at 1114. Such musings on the part of Carlson neither breached the CRSA nor evinced a clear intention to violate that agreement.

**275.** *See Dunlap v. Sunbeam Corp.*, 1999 WL 1261339, at *6 (Del.Ch. July 9, 1999) (declining to award fees on fees because defendant's actions in disputing plaintiff's request for attorneys fees' were not "so egregious or in such bad faith as to require that special form of discipline.").

and expenses through proportional contribution from all of those who, as a result of the plaintiff's individual efforts, receive a common benefit."[276] Delaware courts frequently apply this exception in the derivative suit context,[277] although "[t]he determination of any award is a matter within the sound judicial discretion of the Court of Chancery."[278] Because Contact's fiduciary duty claims are derivative in nature and because Contact secured a recovery for CR, the Court normally would determine an award of attorneys' fees using the *Sugarland* factors.[279] The circumstances of this case, however, cause the Court to question whether Contact actually created a common fund.

In *Tandycrafts, Inc. v. Initio Partners,* the Delaware Supreme Court held that "the question to be determined" in deciding whether to award attorneys' fees "is whether a plaintiff ... has conferred a benefit on others,"[280] Carlson's contract claims are direct claims that only benefit him. Although Contact's derivative claims arguably benefit CR, as well as Contact, the benefit to CR is tempered by the fact that Hallinan and Gordon are the only other stockholders of CR and one or both of them will be making the damage payments to CR.

In the typical derivative suit where the corporation recovers money damages, the corporation is the direct beneficiary in the sense that it receives the damages, while the corporation's shareholders benefit indirectly from the increased value of the corporation. The plaintiff thus has secured a benefit for the corporation and all of its shareholders. Here, CR will recover money damages from Hallinan and Gordon and Hallinan's companies TC and Main Street, but because of the Court's decision on dissolution, 30% of the recovered money damages will go to Plaintiff Contact while the remainder will be returned to the Director Defendants. When this action is finally resolved, there actually will not be a surviving corporation on which to confer a benefit. Plaintiffs, however, have enforced important corporate rights and likely have conferred a benefit on Gordon, as well. Gordon may receive via the dissolution more than he must repay to CR in damages and also will have his 5% minority stake in CR monetized. Thus, Plaintiffs are entitled to their *reasonable* attorneys' fees spent prosecuting their *derivative* claims, but only those claims.

The public policy rationales behind the common fund doctrine also support an award of attorneys' fees in this case. The Delaware courts award attorneys' fees in common fund cases first because the doctrine's "underpinnings ... lie in equity's desire to assure that persons who benefit from a lawsuit without contributing to its costs are not unjustly enriched at the suc-

---

276. *Wolfe & Pittenger* § 9–5[a].

277. *See, e.g., Seinfeld v. Coker,* 847 A.2d 330 (Del.Ch.2000) (awarding $250,000 in a derivative action); *In re Abercrombie & Fitch Co. S'holders Derivative Litig.,* 886 A.2d 1271 (Del. 2005) (affirming Court of Chancery's approval of a settlement and fee award in a derivative action).

278. *In re Abercrombie & Fitch Co.,* 886 A.2d at 1272 (internal quotation omitted).

279. *Id.* (observing that the Delaware Supreme Court established the appropriate standard by which fees are to be calculated in *Sugarland Indus. v. Thomas,* 420 A.2d 142 (Del.1980)).

280. 562 A.2d 1162, 1166 (internal quotation omitted). In this context, "others" includes the corporation itself *Id.* at 1164 ("In the realm of corporate litigation, the Court may order the payment of counsel fees and related expenses to a plaintiff whose efforts resulted in ... the conferring of a corporate benefit.") (internal citation omitted).

cessful litigant's expense." [281] Gordon thus should not benefit without contributing to Plaintiffs' cost. The Delaware courts also award attorneys' fees pursuant to this doctrine to provide an incentive to stockholders "to bring a . . . derivative suit to enforce the rights of . . . the corporation as a whole under circumstances in which filing suit to enforce only their individual rights would be prohibitively costly or otherwise impracticable, thereby leaving unchallenged actionable wrongs against the . . . corporation." [282] Thus, Plaintiffs should receive their attorneys' fees to incent future plaintiffs to bring suit to right corporate wrongdoing.

## IV. CONCLUSION

For the reasons stated, the Court concludes that 1) Hallinan breached the oral contract he entered into with Carlson and Mickman by paying himself and Gordon compensation, 2) Hallinan and Gordon did not breach the CRSA by firing Carlson as President of CR, 3) Hallinan and Gordon breached the CRSA when they removed Carlson as a director, but no damage resulted therefrom, 4) Hallinan and Gordon breached their fiduciary duties to CR by paying themselves executive compensation, 5) Hallinan and Gordon breached their fiduciary duties to CR by causing it to pay a management fee, 6) Hallinan and Gordon breached their fiduciary duties to CR by causing it to pay the expenses of Main Street, TC and Axcess, 7) Hallinan and Gordon did not usurp a corporate opportunity of CR's by not moving it to the Licensed Lender Model, 8) Plaintiffs failed to prove damages for any possible breach of the duty of loyalty Hallinan and Gordon might have committed by not moving CR to the Licensed Lender Model, 9) Hallinan and Gordon did not breach their fiduciary duties to CR when they removed Carlson as President of CR, 10) CR's payment of Hallinan and Gordon's defense costs for this action was *ultra vires* and thus void, 11) Main Street and TC aided and abetted certain of Hallinan and Gordon's breaches of fiduciary duties and thus are jointly and severally liable for those breaches, 12) Plaintiffs are entitled to payment of their reasonable attorneys' fees for the Section 220 action, but not fees on fees, and 13) Plaintiffs are entitled to payment of their reasonable attorneys' fees for the derivative portion of this action. The remedies for the breaches of contract and fiduciary duties and related wrongdoing referred to in items 1, 4–6, and 11, are specified *supra* at section III.E. In addition to damages, those remedies include an accounting and the dissolution of CR.

Plaintiffs' counsel shall submit, on notice and forthwith, a proposed form of order embodying the Court's rulings. Plaintiffs also shall submit, on notice, a detailed application for their attorneys' fees incurred in the prosecution of the derivative portion of this action. Defendants shall have twenty days to object to that application.

---

**281.** *Wolfe & Pittenger* § 13–3[c] (internal citations omitted).

**282.** *Wolfe & Pittenger* § 9–5[a] (internal citations omitted).