**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: April 17, 2023
Date Decided: May 5, 2023

Sean J. Bellew, Esquire
BELLEW, LLC
2961 Centerville Road, Suite 302
Wilmington, DE 19808

Sean A. Meluney, Esquire
William M. Alleman, Jr., Esquire
Stephen A. Spence, Esquire
MELUNEY ALLEMAN & SPENCE, LLC
1143 Savannah Rd., Suite 3-A
Lewes, Delaware 19958

Re: *Fetch Interactive Television LLC, et al. v. Touchstream Technologies Inc., et al.*, C.A. No. 2017-0637-SG

Dear Counsel:

Litigation, properly viewed, is a tool to achieving a just result. Sometimes, for the parties, litigation, and victory in litigation, become ends in themselves. This matter has some flavor of that unfortunate condition.[1] This letter opinion is the second post-trial decision in a case that has spanned six years, two trials, and multiple sets of counsel on both sides. The most recent trial of October 5, 2022 centered on a single, narrow issue: whether an ambiguous May 2017 email exchange formed a binding contract entitling Plaintiffs to an equity stake in Defendant Touchstream Technologies, Inc. (the "Company").[2] Weighing the substantial body

---

[1] The situation described is most likely where, as here, the principals consider themselves ill-used by their opponents, making the contest a misplaced morality play. I should point out that current counsel are in no way contributing to any economically unsound litigation practice.

[2] Pre-trial Stipulation and Order ¶ 1, Dkt. No. 275.

of evidence presented in the record, I find that the Plaintiffs have failed to establish a meeting of the minds between the parties sufficient to support a contract.[3]

Because my Memorandum Opinion of January 15, 2019 contains a thorough discussion of this case's factual background,[4] I limit my discussion here to only the evidence relevant to Plaintiffs' surviving contractual theory. Briefly, Defendant Herbert Mitschele is a principal of the Company; Plaintiff Charles Siemonsma is the founder of Plaintiff Fetch Interactive Television, LLC.[5] Plaintiffs and Defendants had a business relationship. In early 2017, the Company needed funds, and determined to meet that need through issuance of debt convertible to equity. At the same time, Siemonsma wished to purchase equity in the Company. Plaintiffs contend that a May 17 email from Mitschele (the "May 17 Email") to Siemonsma was a valid and enforceable offer, for which Siemonsma's May 19 response (the "May 19 Reply") constitutes acceptance.[6] At the time, Mitschele owned 14.14% of the Company's equity and had the right to participate to at least that extent in the rights offering.[7] The pertinent section of the May 17 Email reads:

> Below are the details for the rights offering that was sent to the shareholders. I am not sure what amount will be available at this time,

---

[3] Citations in the form of "Tr. __" refer to the trial transcript for the second phase of trial, Dkt. No. 284. Citations in the form of "JX __" refer to the parties' joint trial exhibits for this phase of trial, Dkt. No. 281.

[4] Revised Mem. Op. 1-40, Dkt. No. 138.

[5] *Id.* at 5-6.

[6] Pls.' Confidential Post-Trial Opening Br. for Trial Phase 2 ("PL PTOB") 29-37, Dkt. No. 288.

[7] *See* Tr. 191:16-192:15 (describing how Mitschele "sacrificed" his 14.14% stake by not participating in the offering).

> so the best thing to do is to wire enough to cover my amount and I will discuss whether there is more room or I will return any funds that weren't able to make it after the round closes. The amount representing my interest is [$69,880.63].[8]

Per Plaintiffs, I should read this offer (together with Siemonsma's acceptance) as an agreement for Siemonsma to step into Mitschele's shoes as an existing investor, allowing him to buy the 14.14% share of the convertible note offering available to Mitschele.[9]  Moreover, the Plaintiffs contend that this transfer of equitable ownership was complete when Siemonsma accepted the offer and wired payment, on May 19.[10]  Plaintiffs argue that this 14.14% stake then entitled them (as an "existing investor" beneficially owning the stock formerly held by Mitschele) to "oversubscribe" by purchasing any debt that remained unclaimed after the funding deadline, which the Plaintiffs maintain was substantial.[11]  The Plaintiffs argue that specific performance should therefore result in their ownership of more than 40% of the Company.[12]

The problem with the Plaintiffs' position is that the May 17 email does not embody such terms; at best, it is ambiguous.

---

[8] JX 35 at 1.

[9] PL PTOB at 31-32.  Existing investors were given priority because the new notes, once converted to equity, would almost completely dilute existing equity positions.  *See* JX 13; JX 30; Tr. 157:21–158:14.

[10] PL PTOB at 33-35.

[11] *Id.* at 35-36

[12] *Id.*

Defendants counter that the May 17 Email "was a manifestation of [Mitschele's] willingness to allow Mr. Siemonsma to be the first outside investor to participate in the convertible note if existing stockholders did not fully subscribe[.]"[13] Mitschele knew he would not be participating in the note offering personally, which left "his *pro rata* portion of the note potentially available if existing [Company] stockholders did not oversubscribe to cover it."[14] Defendants note that the May 17 Email suggests that Siemonsma wire enough to cover that potential shortfall, but also promises to "return any funds that weren't able to make it after the round closes."[15] Defendants therefore argue that the May 17 Email should be interpreted as an attempt to secure conditional funding coverage in case existing stockholders undersubscribed.[16]

Plaintiffs seek specific performance on the basis of the purported contract formed by the May 2017 email exchange.[17] A party seeking specific performance must establish by clear and convincing evidence[18] that "(1) a valid contract exists,

---

[13] Defs.' Opening Post-Trial Br. ("DF PTOB") 27, Dkt. No. 287.
[14] *Id.*
[15] JX 35 at 1.
[16] DF PTOB at 28.
[17] *See* Pls.' Post-Trial Reply Br. for Trial Phase 2 ("PL PTAB") 34, Dkt. No 289 (requesting that the Court order the Company to issue shares to Plaintiffs based on the purported contract).
[18] *See, e.g., Pulieri v. Boardwalk Properties, LLC*, 2015 WL 691449, at *8 (Del. Ch. Feb. 18, 2015) (denying specific performance because plaintiff failed to show the existence of an enforceable contract by clear and convincing evidence). As a matter of doctrine, the higher standard is justified. An enforcement of a contract at law results only in damages. Seeking the equitable relief of specific performance invokes the awesome power of the positive injunction, which is available where justice requires but is not employed lightly by a court of equity.

(2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance."[19] The first element required of a valid contract is that "the parties intended that the contract would bind them[.]"[20] In determining the parties' intent to be bound, the court can look to both communications between the parties leading up to the purported contract, as well as contemporaneous agreements or negotiations.[21]

The burden is on Plaintiffs to present clear and convincing evidence showing that, because Defendants shared Plaintiffs' understanding of the May 17 Email, there was a meeting of the minds.[22] Finding the text of that email ambiguous, I draw on the record's extrinsic evidence in assessing the parties' interpretations.[23] I begin with a review of the parties' communications leading up to the May 17 Email, finding that they do not support Plaintiffs' narrative. I then examine the evidence from after the May 17 Email, finding that certain pieces of evidence facially support Plaintiffs' position. However, the trial testimony of Mitschele and Burns rebuts this interpretation. Finally, the testimony of Siemonsma himself further undermines Plaintiffs' arguments.

---

[19] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (citation omitted).

[20] *Id.* (citing *Carlson v. Hallinan*, 925 A.2d 506, 524 (Del. Ch. 2006)).

[21] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1229-30 (Del. 2018).

[22] Plaintiffs' briefing largely focuses on how Siemonsma understood the May 17 Email. *See, e.g.,* PL PTOB at 12-13. While Siemonsma's reading of the email is relevant, Plaintiffs' primary burden is to show that Defendants shared that reading.

[23] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013).

Prior to the May 17 Email, the parties had been in intermittent discussions about Plaintiffs' acquisition of an equity stake in the Company.[24]  During these discussions, Mitschele clarified that any such purchase would be (1) of convertible debt, rather than equity;[25] (2) subject to a cap on the amount of stock Plaintiffs could purchase;[26] and (3) conditional on availability following buy-in by existing investors.[27]  These conditions are consistent with Defendants' current position. Plaintiffs, however, present no credible explanation for their theory's conflict with the third condition.

Plaintiffs draw more substantial support from communications on or after May 17.  Specifically, they point to two emails that Mitschele sent to John Burns (Company chairman)[28] and Rob Sivitilli (board advisor)[29], updating them on the status of the convertible note offering.[30]  In the first update, which Mitschele sent hours after the May 17 Email, Mitschele notes that his calculations "[i]nclude[] my shares being sold to a 3rd party investor."[31]  Plaintiffs argue that this is evidence of Mitschele's contemporaneous intent to "sell" his *pro rata* share of the offering to

---

[24] *See* JX 4; JX 5; JX 15; JX 16; JX 21; JX 24.
[25] *Compare* JX 21 at 2 *with* JX 24 at 2 (Mitschele changing "Purchase of Capital Units" to "Purchase of Debt from Seller").
[26] JX 24 at 1-2.
[27] *Id.*; JX 5.
[28] Tr. 144:17-18, 241:5-6.
[29] Tr. 144:19-145:1, 230:6-7.
[30] PL PTAB at 24-27.
[31] JX 36.

Siemonsma.[32]  However, this explanation conflicts with the trial testimony of both Mitschele and Burns.  Mitschele testified that the note was intended to indicate that his *pro rata* share could be covered by Siemonsma if existing investors didn't oversubscribe.[33]  Burns confirmed that he understood the note to mean, "[Mitschele had] external money on the sidelines and available," in the event the offering to existing investors came up short.[34]  Accordingly, though I find Plaintiffs' reading of the May 17 summary to be facially credible, that credibility is outweighed by the trial testimony directly contradicting it.

On May 19, Mitschele sent another update to Burns and Sivitilli, this time attaching a spreadsheet detailing the current state of the offering.[35]  An entry in that extensive spreadsheet reads "Herb Mitschele (through outside)" in red font.[36]  Per the provided key, red font indicates that the Company had received that investor's paperwork and funds.[37]  Given that Mitschele did not plan to participate in the offering,[38] Plaintiffs contend that this is further evidence that Mitschele intended to have Siemonsma fund his *pro rata*.[39]  However, Mitschele explicitly rejected this

---

[32] PL PTAB at 26.
[33] Tr. 172:18-173:8, 231:10-21.
[34] Tr. 244:15-24, 265:11-17.
[35] JX 47.
[36] *Id.*
[37] *Id.*
[38] Tr. 147:23-148:8.
[39] PL PTAB at 26-27.

theory during trial,[40] testifying instead that he likely color-coded his name red as a mistake.[41] In addition, both Mitschele's testimony and the spreadsheet itself indicate that Siemonsma's money was *not* included in the Company's tabulations.[42] I find that the evidence here does not support Plaintiffs' position.

Mitschele called Siemonsma on the morning of May 20 (only one day after the Plaintiffs contend the contract was formed) to inform him that his funds were being returned.[43] Mitschele testified that, during this call, he explained that the refund was necessary because existing investors had oversubscribed.[44] Siemonsma testified that he received no such explanation.[45] It is undisputed that the Company promptly returned all of Siemonsma's money.[46] I find that the offering was oversubscribed by existing investors, regardless of whether this fact was explained during the May 20 call. This is consistent with Defendants' position.[47]

---

[40] Tr. 236:6-237:12.

[41] Tr. 236:6-16.

[42] Tr. 236:6-237:12; JX 47 (showing Siemonsma's name in black, indicating funding and paperwork not received).

[43] *See* JX 50 at 2 (referring to a call that morning between Mitschele and Siemonsma).

[44] Tr. 182:11-23, 218:21-219:1.

[45] Tr. 79:20-80:2.

[46] JX 50 at 1; Tr. 79:5-19.

[47] Plaintiffs argue that the oversubscription explanation fails because insufficient funds were committed by the deadline of May 19th at 5:00 PM. PL PTAB at 30-33. However, Defendants expressly reserved the option to unilaterally extend the deadline. JX 35 at 3. Mitschele and Burns testified that the deadline was extended to accommodate existing stockholders. Tr. 245:15-18; 262:6-8. Plaintiffs focus on the lack of documentation supporting such an extension but fail to explain why documentation was required. PL PTAB at 30-33.

Finally, I look to an additional component of Siemonsma's trial testimony. On cross-examination, Siemonsma testified that, as of May 20th, he was still in negotiations with Defendants regarding a stake in the Company.[48] This testimony, which Plaintiffs decline to address in briefing, directly conflicts with Plaintiffs' theory that a binding contract was formed by Siemonsma's May 19 Reply.

Weighing the extrinsic evidence from both before and after May 17, together with trial testimony, I find that Plaintiffs have not proved their interpretation by clear and convincing evidence. In fact, I find Defendants' position to be more consistent with both the text of the May 17 Email and the record, and that the Plaintiffs have failed to show an enforceable agreement even by a preponderance of the evidence.[49] Accordingly, because the record does not indicate the existence of a valid contract, Plaintiffs' specific performance claim must be denied.

To the extent the foregoing requires an order to take effect, IT IS SO ORDERED.

Sincerely,

*/s/ Sam Glasscock III*
Vice Chancellor

---

[48] Tr. 131:19-132:23.
[49] The Plaintiffs concede that they have not proven damages; they seek only equitable relief. Tr. of 4.17.23 Post-Trial Oral Arg. 32:20-33:8, Dkt. No. 296.